# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 81

### APRIL TERM, A.D. 2021

### July 8, 2021

|  |  |
|---|---|
| IN THE INTEREST OF: SW, CW, HW and NW, minor children, | |
| AW, | |
| Appellant (Respondent), | |
| v. | |
| THE STATE OF WYOMING, | |
| Appellee (Petitioner). | S-20-0242, S-20-0243 |
| IN THE INTEREST OF: SW, CW, HW and NW, minor children, | |
| KM, | |
| Appellant (Respondent), | |
| v. | |
| THE STATE OF WYOMING, | |
| Appellee (Petitioner). | |

*Appeal from the District Court of Carbon County*
*The Honorable Dawnessa A. Snyder, Judge*

*Representing Appellant AW:*
        David McCarthy, David McCarthy, P.C., Rawlins, Wyoming.

*Representing Appellant KM:*
        Jennifer K. Stone, Schilling, Winn & Stone, P.C., Laramie, Wyoming.

*Representing Appellee:*
        Bridget Hill, Wyoming Attorney General; Misha Westby, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Christine F. McCabe, Senior Assistant Attorney General.

*Guardians ad Litem:*
        Joseph R. Belcher, Director, Wyoming Office of the Guardian ad Litem; Kim Skoutary Johnson, Chief Trial and Appellate Counsel; Tamara K. Candelaria, Guardian ad Litem.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*\* Chief Justice at time of brief-only conference.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]   Both AW (Mother) and KM (Father) appeal from the juvenile court's order changing the permanency plan for their four children[1] from reunification to adoption. Their appeals have been consolidated.  Mother and Father assert that the juvenile court abused its discretion when it determined that the Department of Family Services (DFS) made reasonable efforts to reunify the children without offering specialized services.  We affirm.

## *ISSUE*

[¶2]   Mother and Father raise the same issue, which we rephrase:

> Did the juvenile court abuse its discretion when it found DFS had provided reasonable efforts to reunify the family where specialized care was not provided to Mother or Father?

## *FACTS*

[¶3]   The family lives in Rawlins, Wyoming, and consists of Mother, Father, and four minor children.  When this matter began, NW was seven years old; HW, three years old; CW, two years old; and SW was a newborn.[2]

[¶4]   On February 11, 2019, while Mother was pregnant with SW, DFS received a call reporting possible marijuana sales out of the family garage and raising concerns about home conditions.  DFS responded.  On being asked, Father denied selling marijuana but admitted smoking it.  The children were unwashed and the home dirty.  DFS instructed the family to attend to the children and clean the home.  It advised Mother and Father there would be a follow-up visit.  This was the first of many incidents leading to the present proceeding and these appeals.

---

[1] While KM is referred to as Father throughout this opinion, there is lack of clarity in the record over Father's biological parentage of some of the children.  Father's brief indicates that he is the biological father of CW and the stepfather of NW, HW, and SW.  However, the State's brief indicates that "Father's children are CW, HW, and SW, but not NW."  The August 12, 2019 Predisposition Report indicates Father is the father of CW, but not NW, HW, or SW.

[2] The family has a history with DFS.  Prior to the birth of her youngest three children, when Mother lived in Torrington, Wyoming, DFS interceded on behalf of NW.  Afterward, between 2014 and 2018, DFS incident reports included: multiple complaints regarding the conditions of the home (some characterizing the conditions as "deplorable," "utter filth," describing dried cat placenta on the floor, animal feces, cigarette butts, and urine-saturated carpet), neglect of the children, failure of CW to thrive, neglect of NW, and other reports (including feeding concerns when HW was a baby, and cleanliness).

[¶5]    DFS returned and, finding the conditions unchanged, created a safety plan addressing the children's hygiene, home conditions, and the marijuana possession and use.[3]  Shortly thereafter, Father was charged with possession of marijuana prompting DFS to return again.  At that time, Mother was in the hospital, having just given birth to SW.  SW was born with nicotine withdrawal due to Mother's tobacco use during pregnancy.  DFS notified Mother and Father that there would be an investigation of the identified concerns, and both parents would be required to submit to urinalysis testing.

[¶6]    When discharged from the hospital, SW was on oxygen.  In April 2019, DFS received a report that doctors did not believe Mother or Father were properly administering SW's oxygen.  DFS conducted a home check and found SW without oxygen, asleep on his stomach, and experiencing labored breathing.  SW's oxygen levels were low, and DFS advised Mother and Father to follow doctor's orders in administering oxygen.  During this same visit, DFS addressed concerns with Mother and Father about NW's continuing problems with head lice.  DFS also talked to them about their household roommate who had been arrested for furnishing alcohol to minors.  On leaving, DFS contacted the nurse practitioner who had reported the oxygen concern.  The nurse practitioner made clear that SW needed to be on oxygen full time and advised that she and SW's doctor would like him to be brought to the hospital for observation.  DFS returned to the home to find SW again without oxygen.  DFS relayed the nurse practitioner's medical advice to Mother, who then drove SW to the hospital.  DFS followed.  After arriving at the hospital, SW was transported to Denver for treatment.

[¶7]    DFS filed a neglect petition relating to SW on April 11, 2019.  The juvenile court placed SW in DFS custody and ordered foster care placement on his discharge from the hospital.  SW was discharged and placed with a foster care family with orders that he be on oxygen full time—twenty-four hours a day, seven days a week.

[¶8]    Mother and Father were given the opportunity for visitation with SW from 8:00 a.m. through 5:00 p.m., Mondays through Fridays.  Mother requested visitation be reduced from 40 hours per week to 12, but ultimately agreed to 24 hours per week. Mother and Father visited SW at DFS facilities between April 20 and May 31, 2019.

---

[3] The DFS policy manual defines a safety plan as a

> [d]etailed plan of action made in response to specifically identified danger that creates clear and observable guidelines regarding the potential danger and how the child/adult/community are to be protected. [It i]dentifies and implements specific ways of controlling threats to safety.  A safety plan shall become part of the case plan for vulnerable adult/child(ren)/families who are receiving services or have a substantiated allegation of abuse or neglect.

Wyo. Dep't of Fam. Servs. Pol'y Manuals, Glossary of Terms, *Safety Plan* (2021), www.dfs.wyo.gov/about/policy-manuals/glossary-of-terms/.

While DFS did not supervise the entirety of these visits, DFS workers periodically checked on the family. Repeatedly, even after receiving instructions, Mother would lay SW on his stomach on the floor and remove his oxygen. Mother and Father rarely held him. When Mother did hold him, she failed to support his head. During the visits, the other children were uncontrolled and subjected to inappropriate discipline from Father. Mother showed DFS workers how to turn off the oxygen alarm instead of looking for the cause of the alarm. Once, Mother left SW on the floor and exited the room. She inadvertently locked herself out, leaving SW inside, unattended.

[¶9] In mid-May, DFS received a report alleging abuse of the other three children. The report claimed the children were locked in their rooms for extended periods, and again raised concerns about the condition of the home. On May 29, 2019, Father, while visiting SW at his foster home, forcefully picked CW off the floor by his arm. This caused CW's elbow to "pop" and his arm to bruise. CW, and the other two children still in Mother and Father's care, were examined by a medical professional. Bruising was found on CW and AW. All three had head lice (NW, seven times in the preceding eight months) and were dirty. DFS was also concerned that NW consistently assumed the role of caretaker for the younger children. DFS took the three children into protective custody.

[¶10] A second neglect petition was filed against Mother and Father, this time relating to all four children. Mother and Father admitted to the allegations of neglect.[4] The juvenile court placed the children in DFS custody, ordered Mother and Father to complete a parenting class, and required DFS to file a case plan. The later-filed case plan required Mother and Father to focus on parenting skills, home cleanliness, and communication. It directed them to attend counseling.

[¶11] The August 2019 Predisposition Report indicated that Mother and Father continued to struggle with caring for the children. They experienced problems with parental bonding and empathy toward SW. They continued to have difficulty keeping their home clean. A psychological assessment was recommended. A disposition hearing followed. Nonetheless, CW, HW, and NW were returned to the custody of Mother and Father, under DFS supervision. SW remained in foster care. Mother and Father were ordered to complete psychological evaluations and bonding assessments. In November 2019, Father tested positive for methamphetamine; and, after an emergency change of placement hearing, CW, HW, and NW returned to foster care.

[¶12] Independent bonding assessments of Mother and Father revealed that Mother and Father had significant parenting strengths, but that SW had not bonded with Mother. A

---

[4] DFS closed the first neglect case relating to SW, but the record here is not clear about the juvenile court resolution of that action.

3

substance abuse evaluation filed in January 2020 recommended Mother receive psychological treatment. Dr. Mark Gibson, a licensed psychologist, conducted psychological evaluations of Mother and Father. Dr. Gibson's evaluations, filed on January 21, 2020, concluded Mother suffered from major depressive disorder, borderline personality disorder, and needed mental health services. He recommended individual therapy and "a psychiatric referral . . . to assess the need for medication." Mother began receiving individual therapy in December 2019 and took medication for depression. Dr. Gibson diagnosed Father with adjustment disorder with depressed mood. Dr. Gibson recommended substance abuse treatment and a parenting course. Father received substance abuse treatment, some parenting instruction, and individual counseling.

[¶13] Between February 2019 and June 2020, Mother and Father received many services including:

- DFS developed eight safety plans. These plans included strategies to assist Mother and Father in addressing the conditions of the home; treating the children's head lice; limiting NW's role as caretaker; understanding SW's health needs; care of the children; avoiding the children's exposure to inappropriate people; and using appropriate punishments versus physical abuse.

- DFS caseworkers made nearly daily visits to the home.

- DFS cleaned the house.

- DFS removed headlice.

- DFS provided checklists to assist Mother and Father with parenting and cleaning.

- DFS provided one-on-one parenting courses for Mother and Father.

- DFS provided psychological and parenting evaluations.

- DFS transported Mother and Father to psychological evaluations.

- DFS provided substance abuse counseling for Mother and Father.

- DFS provided individual mental health counseling for Mother and Father.

- DFS provided individual counseling for the children.

- DFS provided family therapy.

- DFS provided group parenting classes.

- DFS supervised visitations over an extended period of time.

[¶14] In February 2020, DFS began working on a plan to transition the children home. SW's foster family was relocating, and, as a result, the plan provided that he would return home first and the other children would follow. SW was placed in the home with daily checks by DFS. Mother and Father did not maintain his oxygen and left him unattended. The home was messy. SW was placed back in foster care. Yet, DFS continued to work at reunification, initiating overnight visits for CW, HW, and NW as a prelude to their transition home. In April 2020, the overnight visits stopped because health and safety concerns remained unabated. At the next multidisciplinary team meeting, the guardian ad litem and DFS recommended the permanency plan be changed to adoption for SW, and guardianship for CW, HW, and NW. Attorneys for Mother and Father recommended that reunification efforts continue for all the children and requested an evidentiary hearing.

[¶15] In February 2020, the juvenile court ordered parental capacity evaluations of Mother and Father. These were completed in April by Dr. Amanda Turlington, a licensed clinical psychologist. She concluded that Mother "lack[ed] the ability to safely and appropriately parent her children at this time." Father lacked "abilities to adequately and safely provide for the children's needs, as well as nurture them appropriately"; and he "lack[ed] the motivation needed [to] change at this time."

[¶16] In June, the juvenile court held an evidentiary permanency hearing. It found that reunification with Mother and Father was not in the children's best interests; DFS had not only made reasonable efforts, but "extraordinary" efforts to reunify the family; and the offered services were "available, accessible and appropriate." It concluded reasonable efforts to reunify were no longer required because these had been unsuccessful and that the plan should be changed to adoption. Mother and Father appeal.

### STANDARD OF REVIEW

[¶17] To change a permanency plan, the juvenile court must determine whether the current plan is in the child's best interests and whether DFS has made reasonable efforts to finalize the plan. Wyo. Stat. Ann. § 14-3-431(k)(i); *In re RE*, 2011 WY 170, ¶ 10, 267 P.3d 1092, 1096 (Wyo. 2011). If the court determines that the permanency plan is no longer in the child's best interests and reasonable efforts have been unsuccessful, the court may change the permanency plan. *KC v. State*, 2015 WY 73, ¶ 25, 351 P.3d 236, 243 (Wyo. 2015). "The State must justify the change in the permanency plan by a

preponderance of the evidence." *KC*, ¶¶ 24–25, 351 P.3d at 243; *RE*, ¶ 12, 267 P.3d at 1096 (citing *In re HP*, 2004 WY 82, ¶ 25, 93 P.3d 982, 989 (Wyo. 2004)).

[¶18]   When this Court is required to determine whether a juvenile court erred in finding that the permanency plan should be changed to adoption, the standard of review is abuse of discretion.  *KC*, ¶ 18, 351 P.3d at 242; *RE*, ¶ 10, 267 P.3d at 1096.  The Court considers the reasonableness of the juvenile court's decision considering the evidence before it.  *RE*, ¶ 11, 267 P.3d at 1096.  We evaluate the sufficiency of the evidence against the preponderance of the evidence standard to determine whether the juvenile court's decision is supported by the evidence.  *RE*, ¶ 12, 267 P.3d at 1096.  We give considerable deference to the juvenile court and examine all the evidence in the light most favorable to DFS.  *In Int. of JW*, 2018 WY 22, ¶ 20, 411 P.3d 422, 426 (Wyo. 2018); *see also KC*, ¶¶ 18, 51, 351 P.3d at 242, 248–49.  If the juvenile court's conclusion was within the bounds of reason, it did not abuse its discretion and we will not reverse.  *RE*, ¶ 11, 267 P.3d at 1096.

## DISCUSSION

### I.   *Did the juvenile court abuse its discretion when it found DFS had provided reasonable efforts to reunify the family where specialized care was not provided to Mother or Father?*

### A.   Reasonable Efforts

[¶19]   In abuse and neglect cases, DFS must make reasonable efforts to "preserve and reunify the family[.]"  Wyo. Stat. Ann. § 14-3-440(a); *see Matter of BAD*, 2019 WY 83, ¶ 27, 446 P.3d 222, 228–29 (Wyo. 2019); *In re SJJ*, 2005 WY 3, ¶ 34, 104 P.3d 74, 83–84 (Wyo. 2005).  "[R]eunification efforts are aimed at preventing removal of the child[ren] or making it possible to return the child[ren] to [their] home."  *Int. of VS*, 2018 WY 119, ¶ 42, 429 P.3d 14, 26 (Wyo. 2018).  The children's health and safety are the paramount concern in determining the efforts required.  *VS*, ¶ 43, 429 P.3d at 26; Wyo. Stat. Ann. § 14-3-440(b).  "To that end, 'timely placement of children in accordance with a permanency plan may take precedence over family reunification, and reunification efforts inconsistent with the permanency plan may be discontinued.'"  *VS*, ¶ 43, 429 P.3d at 26 (quoting *In re NDP*, 2009 WY 73, ¶ 21, 208 P.3d 614, 619 (Wyo. 2009)).

[¶20]   "Reasonable efforts are determined on a case-by-case basis."  *In re DRS*, 2011 WY 128, ¶ 33, 261 P.3d 697, 706 (Wyo. 2011).  "Reasonable efforts determinations shall include whether or not services to the family have been accessible, available and appropriate."  Wyo. Stat. Ann. § 14-3-440(e) (LexisNexis 2019).  "Wyo. Stat. Ann. § 14-3-440(e)'s 'accessible, available and appropriate' language and *In re HP*'s discussion of 'tailored' case plans suggest that the Department is obligated to make reasonable efforts suitable to the unique situation of the family involved."  *BAD*, ¶ 37, 446 P.3d at 232 (J.

6

Fox, concurring). This Court has observed that in assessing reasonableness, "there is a limit to what courts can require[.]" *JW*, ¶ 21, 411 P.3d at 426. Further, "[a] parent's failure to take advantage of available services, or to meaningfully participate in a case plan developed by DFS with [a parent's] input, is persuasive evidence that reasonable rehabilitative efforts have been unsuccessful." *Id.* (footnote omitted) (citing *SD v. Carbon Cnty. Dep't of Fam. Servs.*, 2002 WY 168, ¶ 23, 57 P.3d 1235, 1241 (Wyo. 2002)).

## B.      Reasonable Efforts to Reunify the Children with Mother

[¶21] Mother contends that, while there is "no doubt that DFS has . . . provided many services" to the family, the juvenile court abused its discretion when it found reasonable efforts had been provided. Mother argues that Dr. Turlington identified psychological services in Mother's parental capacity evaluation that had not been provided and were not available in Rawlins. She argues because DFS did not provide those services, it did not make reasonable efforts to reunify her with her children.

[¶22] Dr. Turlington did not complete Mother's parenting capacity evaluation until April 2020. Her report is thorough and is not so linear as Mother suggests. Dr. Turlington's report points out, "[t]he largest obstacles [to Mother's ability to parent] appear to be [Mother's] lack of psychological stability, which recently has been increasing, as well as her resistance to input from outside professional service providers" and noted that Mother had "the capacity to change, including making cognitive and emotional developments needed to advance her parental strengths." At the hearing, Dr. Turlington testified, "It is my understanding that [Mother] has not received, I guess, the standards of care that would be correlated with the most effective and efficient treatment of her diagnosis." However, Dr. Turlington also testified that the care of a psychiatrist "may or may not" be required; she explained Mother needed specialized treatment—someone with "specialized training in personality disorders" which could be a therapist or a psychologist. Dr. Turlington could not say whether the therapies Mother had previously received addressed Mother's maladaptive behaviors, and she could not say whether the psychologic treatment she recommended would help Mother.

[¶23] Dr. Turlington predicted, even if such treatment would help, "[b]ecause of [Mother's] diagnostics, because of the degree of the severity of some of these mental health impairments creating difficulties and dysfunction in her life, . . . that it would be a long-term process" and that Mother may never reach psychological stability.

[¶24] While it is undisputed that Mother did not receive psychiatric care, Samantha Howley, a counselor, provided Mother with substance abuse and mental health counseling—group therapy for substance abuse issues and individual counseling for Mother's mental health. At the time of the permanency hearing, Mother had been in

7

counseling with Ms. Howley for six months. Mother testified that she had taken medication for her depression since approximately June 2019.

[¶25] Further, despite numerous evaluations, interventions, and other services provided by DFS, Mother demonstrated an unwillingness to take direction from those who were attempting to rehabilitate her and reunify the family. Dr. Pamela Zeitlin noted that Mother and Father struggled with "accepting that there [was] something wrong with [SW]," which resulted in repeated instances of deliberately failing to administer oxygen to him as directed. Kari Skordas, a mental health therapist, explained that Mother and Father were "putting in their time," but they blamed others for their situation, did not demonstrate consistent improvement, and were "not receptive to new information" or feedback. Erin Brock noted similar patterns during her interactions with the family. She testified that when she addressed behaviors with Mother and Father, they did not attempt to change. Finally, Dr. Turlington recognized that Mother was "working against . . . changes which could benefit the health and security of her children."

[¶26] We have explained that "in the absence of parental cooperation . . . continuing efforts to rehabilitate the parent become not only unreasonable, but contrary to a child's best interest at some point." *JW*, ¶ 21, 411 P.3d at 426. "[A]n agency is not required to provide services indefinitely when a parent is either unable or unwilling to apply the instruction received." *In re R.T.*, ¶ 21, 778 A.2d 670, 681 (Pa. Super. Ct. 2001). In *NDP*, the children had been in foster care for more than a year, "during which time [the mother] had not made any significant advances toward reunification." *NDP*, ¶ 30, 208 P.3d at 620. We held that "the juvenile court properly concluded that the State had proven by a preponderance of the evidence that continuation of efforts to reunite the children with [the mother] was inconsistent with the permanency plan of placing the children in a long-term guardianship." *Id.* ¶ 31, 208 P.3d at 621.

[¶27] In determining what efforts are required, the child's health and safety are the paramount concern. Wyo. Stat. Ann. § 14-3-440(b). By the time of the permanency hearing in this case, Mother had received extensive services, and Dr. Turlington could not say whether additional services would be successful. It was her prediction that if additional services were successful, the process would be long term. The "timely placement of children in accordance with a permanency plan may take precedence over family reunification, and reunification efforts inconsistent with the permanency plan may be discontinued." *VS*, ¶ 43, 429 P.3d at 26 (quoting *NDP*, ¶ 21, 208 P.3d at 619). Children do not have the luxury of time. "At some point, the rights and needs of the children rise above the rights and needs of the parents." *In re B.J.*, No. 14-0938, 2014 WL 4938003, at *2 (Iowa Ct. App. Oct. 1, 2014) (quoting *In Int. of J.L.W.*, 570 N.W.2d 778, 781 (Iowa Ct. App. 1997) (*overruled on other grounds by In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010))). "A child should not be forced to endlessly suffer the parentless limbo of foster care." *B.J.*, 2014 WL 4938003, at *2; *see also* Wyo. Stat. Ann. § 14-3-

431(d) (the juvenile court must conduct a permanency hearing no later than twelve months after the child's removal from the home).[5]

[¶28] Here, over the course of two years, Mother has received many intensive and targeted services from DFS. *See supra* ¶¶ 4–15. In concluding that reasonable efforts had been made, the juvenile court recognized that the parental capacity evaluation identified additional services that might have been offered to Mother. It noted that "perhaps" psychiatric services could have been offered, but a psychiatrist was not available in the community. The court discussed the "good mental health counseling" made available and that Mother and Father had been meeting with a counselor for six months. It concluded that based on the evidence presented, efforts were not only reasonable in providing "available, accessible and appropriate" services, they were "extraordinary."

[¶29] The evidence was sufficient for the juvenile court to conclude that reasonable efforts to reunify the children with Mother had been made and no further efforts were required, despite the potential for additional psychological or psychiatric care. The juvenile court did not abuse its discretion. *See JW*, ¶ 21, 411 P.3d at 426.

## C.    Reasonable Efforts to Reunify the Children with Father

[¶30] Father's argument is nearly identical to Mother's. He argues DFS failed to provide available, accessible, and appropriate services because DFS did not provide him with a therapist who specialized in personality disorders, as recommended by Dr. Turlington.

---

[5] As one commentator has explained:

> Concern for permanency places a limit on the . . . mandate that state child protective services make reasonable efforts to reunify children in foster care with their parents. Returning a child quickly to her parents satisfies the interest in permanency, but what should happen if the parents are not ready to take back the child? How long can reunification efforts take before the damage of unstable custody arrangements occurs? At what point should agencies give up on parents for the sake of placing children in a permanent home? Most states are not willing to wait forever for parents to become fit enough to regain custody of their children. Most have enacted statutes that make the length of time a child remains out of the legal custody of the parent a ground for terminating the parent's rights. Indeed, "the most commonly used ground for termination is a finding that a child has been out of the custody of the parent, usually in foster care, for a statutory period of time . . . ."

Dorothy Roberts, *The Challenge of Substance Abuse for Family Preservation Policy*, 3 J. Health Care L. & Pol'y 72, 74–75 (1999) (footnotes omitted).

[¶31] As discussed above, Father, like Mother, received significant services. A parenting class was offered to Father, but he chose not to attend because of work-related issues. Father attended a round of one-on-one parenting instruction with Ms. Skordas, a mental health therapist. Father received group substance abuse counseling and individual mental health counseling. Father participated in counseling for six months.

[¶32] Dr. Turlington conducted a parental capacity evaluation for Father. Her report noted that Father has alcohol, cannabis, and stimulant use disorders (all moderate and in early remission) and an antisocial personality disorder. The evaluation stated Father was "unable to safely and appropriately parent the children in his family," and would need ongoing, intensive individual therapy. Dr. Turlington recommended Father engage a therapist who specialized in personality disorders. Other suggestions included that Father see an "individual provider who has specialized training to monitor if he's willing to make changes, if he is providing evidence of responsivity, or if he's just going through the motions." Importantly, Dr. Turlington stated that although Father had the potential to change, he lacked the motivation needed to change.

[¶33] Dr. Turlington testified that Father is focused on satisfying his own needs and does not have the ability to make the necessary changes in his profile. Dr. Turlington concluded that Father did not meet the "good enough parent" standard for parenting. She also testified that Father would need to do more than receive specialized therapy to meet the standard of a "good enough parent." Father would need to understand his children, cooperate with individuals and agencies, and develop means to provide his children with safe and appropriate living conditions.

[¶34] Ms. Skordas and Ms. Brock testified that Father was not receptive to change and did not put in the work needed to change and to provide a safe environment for the children. *See supra* ¶ 25. Dr. Turlington reported that "[d]espite [Father] having been physically present during many outpatient individual and group sessions, his 'condition' [was] 'minimally improved since the initiation of treatment.'" Father "denied any responsibility in concerns about his parenting [that have] been identified. Thus, he extends little effort toward changing his role in parenting as he does not endorse a need to alter his parenting style." As explained above, when a parent fails to cooperate, "continuing efforts to rehabilitate the parent become not only unreasonable, but contrary to a child's best interest at some point." *JW*, ¶ 21, 411 P.3d at 426; *see also NDP*, ¶¶ 30–31, 208 P.3d at 620–21.

[¶35] There was sufficient evidence for the juvenile court to find that DFS had made reasonable efforts to reunify the family. The juvenile court did not abuse its discretion.

## *CONCLUSION*

[¶36] The district court's conclusion that reasonable efforts were made to reunify Mother and Father with their children is supported by a preponderance of the evidence. The juvenile court did not abuse its discretion in changing the permanency plan from reunification to adoption even though specialized care was not provided to Mother or Father.

[¶37]  Affirmed.