DAVIS, Justice.
[¶1] TW is the father of two boys, JW and TLW, who were five and three years old when the State of Wyoming filed a juvenile court petition alleging that they had been neglected. He appeals from the court's order altering the plan for permanent placement of the boys from reunification of the family to termination of his parental rights and adoption. We affirm.
ISSUE
[¶2] TW raises a single issue that we slightly restate as follows:
Did the juvenile court abuse its discretion when it determined that the Wyoming Department of Family Services (DFS) made reasonable but unsuccessful efforts to reunify the family, and that the permanency plan for the children should accordingly be changed to adoption?
FACTS
[¶3] On January 28, 2015, the State filed a neglect petition. It alleged that in late December *424 of 2014 the mother of the boys, and of a one-year old girl with a different father, was suspected of using methamphetamine. She was also homeless, and had left the boys with TW's family in the hope that she could retrieve them after she got back on her feet. The daughter was left with her father and Mother's sister. At that time, the boys also needed medical treatment for a severe case of impetigo.
[¶4] Approximately eight months earlier, reports to DFS indicated that Mother was smoking marijuana and not providing the children adequate medical or general care. She was largely uncooperative with DFS's investigation, and for a period beginning in late October of 2014, the agency could not locate her.[1]
[¶5] On August 21, 2015, the State filed an amended neglect petition. It alleged that the three children had been placed in DFS custody in Gillette, that the girl was residing with Mother's maternal aunt, and that the boys were in foster care. The allegations of neglect against Mother remained the same, but the amended petition further asserted that she abandoned the children in January and had failed to respond to requests to become involved in the neglect action. The petition also alleged for the first time that TW had neglected his two sons because his incarceration or detention in the Wyoming penal system made him unable to provide them with the care necessary for their well-being. At that time, he resided at a community corrections facility in Casper as a felony parolee.
[¶6] TW was ordered to come before the juvenile court for an initial appearance and "such other proceedings as are proper" on September 24, 2015. Mother participated in that hearing by telephone, but TW did not appear.[2]
[¶7] TW apparently did not attend the initial appearance because he escaped from detention at the Casper facility the day before the hearing, and a day after his sons visited him there. He remained at large until approximately December 16, 2015, when he was arrested in Gillette for reckless endangerment, attempting to elude officers, and leaving the scene of an accident.
[¶8] A week later, TW had his initial appearance before the juvenile court, and on January 15, 2016, the court issued an order relating to that hearing. It required TW to comply with all terms and conditions of DFS's case plan.[3]
[¶9] Following a trial of the neglect allegations on February 26, 2016, the court determined that TW and Mother had neglected their two sons, and it set a dispositional hearing for April 28, 2016. TW appealed from the court's order adjudicating that he neglected the children.[4]
[¶10] Approximately two weeks after the dispositional hearing, the juvenile court issued an order of disposition. The court concluded that although DFS had made reasonable efforts to reunify the boys with their family, a return to the family home was not in their best interest.[5] With respect to TW, the court allowed his children to visit him at DFS's discretion, and to the extent the circumstances of his incarceration permitted. He was to complete substance abuse and psychological evaluations, sign releases of information to DFS, and follow all recommendations from the evaluations. The court also required him to complete parenting classes if they were available at the facility where he was being held.
[¶11] The court held a permanency hearing on June 3, 2016. Although the State sought a *425 change in the permanency plan to termination of TW's parental rights and adoption, the court found that DFS had not made reasonable efforts toward reunification of TW with his boys, and that the services provided to him up to that point were not accessible, available, or appropriate. However, the juvenile court concluded those failings were attributable to TW's incarceration. It noted that DFS believed it had exhausted all reasonable efforts, but it nevertheless concluded that the permanency plan would remain reunification with TW.
[¶12] Between TW's initial appearance on December 23, 2015 and the June 3, 2016 permanency hearing, TW spent time in penal facilities in both Gillette and Casper because he was facing new criminal prosecutions in both jurisdictions. These circumstances inhibited efforts by his DFS caseworker to work with him to formulate a plan for the provision of services that might lead to reunification. Some of those services, TW asserted, were not available in Gillette, while he preferred to put off others until he was returned to Casper, where he was facing parole revocation and a potential sentence of up to ten years on an escape charge.[6] He ultimately received a sentence of not less than two and not more than three years on the escape charge.
[¶13] On March 28, 2017, the juvenile court held a second permanency hearing.[7] In the interim, TW's circumstances changed considerably. Although he was briefly transferred to Casper, he was then sent to the Wyoming State Penitentiary in Rawlins. Penitentiary officials estimated that he would remain there on his escape sentence until, at the earliest, some unspecified time in 2018.
[¶14] While at WSP, TW was placed in "lockdown" for violating prison rules shortly before a prearranged visit with his young sons. Consequently, they were only allowed an intimidating visit through a glass barrier. Throughout his stay in Rawlins, his efforts to communicate with the boys were haphazard and irregular.
[¶15] TW also balked at taking advantage of the rehabilitative services available to him at the penitentiary. Most services that DFS would have provided to him if he had not been incarcerated could have been provided by the Department of Corrections while he was at the penitentiary through coordination between his DFS and prison caseworkers. Although live parenting classes were not available at the prison, DFS arranged for him to complete those through the mail, and sent him written materials to pursue that end. However, he never enrolled in any substance abuse or mental health programs that were available to him, and he declined to undergo any substance abuse or psychological evaluations unless DFS paid for them. Moreover, he claimed that mental health issues, about which he had previously complained, suddenly were no longer problematic.
[¶16] After reviewing these developments at the second permanency hearing, at which the State again sought termination of his parental rights leading up to adoption, the juvenile court noted that TW's persistent history of criminality had prevented him from ever having much of a relationship with his children, and that it was now the sole reason for any difficulties faced in fostering such a relationship and providing him with the services that might assist him in that endeavor. The court concluded that, given the circumstances he had created, DFS had exerted reasonable efforts and done its "level best" to make it possible for the boys to be eventually returned to his custody.
[¶17] On the other hand, the court saw no sign that TW had taken any responsibility for pursuing opportunities for services and communication that were accessible and available to him at the penitentiary. Rather, he wanted to place all that responsibility on DFS, though he even had failed to sign a release allowing DFS to monitor his progress *426 on his case plan by contacting his prison case worker. The court consequently adopted the recommendation of the multidisciplinary team to change the permanency plan to one directed toward termination of parental rights and adoption. Nevertheless, it ordered DFS to continue to make reasonable efforts to keep TW "in the loop" with respect to his sons.
[¶18] The court memorialized that decision in an order dated April 27, 2017. TW timely perfected an appeal from that order.
DISCUSSION
[¶19] In order to change a permanency plan from one aimed at family reunification to one directed toward adoption, the DFS must show that it made reasonable efforts to achieve unification without success. See generally Wyo. Stat. Ann. §§ 14-3-431(c), (d), (k) ; § 14-3-440 (LexisNexis 2017). TW alleges that the court abused its discretion in finding that DFS made adequate efforts to reunify him with his sons.
[¶20] We review such decisions under the abuse of discretion standard, which looks to the reasonableness of the court's determination and whether it was supported by a preponderance of the evidence. In analyzing the sufficiency of that evidence, we defer to the juvenile court's judgment, examining all evidence in the light most favorable to the State and resolving all evidentiary conflicts in its favor. We assume all of its evidence is true and disregard any contrary proof adduced by the parent challenging the juvenile court's decision. KC v. State , 2015 WY 73, ¶¶ 18, 25, 351 P.3d 236, 242, 243 (Wyo. 2015) ; In re RE , 2011 WY 170, ¶¶ 9-12, 267 P.3d 1092, 1095-96 (Wyo. 2011).
[¶21] DFS has a statutory responsibility to make reasonable efforts to reunify children with their parents. However, in assessing the reasonableness of its efforts in other cases, this Court has observed that there is a limit to what courts can require in the absence of parental cooperation. Without that cooperation, continuing efforts to rehabilitate the parent become not only unreasonable, but contrary to a child's best interest at some point. A parent's failure to take advantage of available services,[8] or to meaningfully participate in a case plan developed by DFS with his input, is persuasive evidence that reasonable rehabilitative efforts have been unsuccessful. SD v. Carbon Cty. Dep't of Family Servs. , 2002 WY 168, ¶ 23, 57 P.3d 1235, 1241 (Wyo. 2002). More particularly, we have held that when a parent is identified as potentially having psychological issues or needs that may adversely affect the likely success of reunification, he must take a proactive role in addressing those issues or needs, and he must do his part by completing the task of obtaining a psychological evaluation. CP v. State, Dep't of Family Servs. , 2009 WY 73, ¶ 28, 208 P.3d 614, 620 (Wyo. 2009).
[¶22] Revisiting the facts we have already stated in light of these standards shows that the juvenile court acted well within its discretion. When the neglect petition was filed, TW resided in a pre-parole release facility in Casper. By the time the petition was amended seven months later to include him, he apparently had been paroled to a community corrections facility, also in Casper. Approximately a month after that, on September 22, 2015, DFS had the two boys transported from Gillette to Casper to visit him. The next day he escaped and consequently did not attend his initial appearance in the neglect case on September 24.
[¶23] After his capture in mid-December in Gillette, he was charged there with three new offenses, and he was charged in Casper with felony escape. As already noted, a week after his capture, he had his initial appearance, and eventually the juvenile court set a permanency hearing for June 3, 2016.
[¶24] Several orders issued in the interim required TW to comply with his DFS case plan, to complete parenting classes if available, *427 to complete substance abuse and psychological evaluations, and to sign releases so that DFS could obtain progress information from any penal authorities holding him. During that time, TW spent time in penal facilities in both Gillette and Casper because he was facing new criminal prosecutions in both jurisdictions. Those circumstances inhibited efforts by his DFS caseworker to formulate a plan for the provision of services that might lead to reunification. Some of those services, he asserted, were not available in Gillette, while the receipt of others was something he preferred to put off until he was returned to Casper, where he was facing a parole revocation and a potential sentence on an escape charge. The juvenile court appears to us to have given TW the benefit of the doubt, and to have exercised its discretion to allow him another chance to take advantage of the services DFS could offer because of the chaos created by these criminal charges, even though he created the chaos.
[¶25] The facts we have already stated demonstrate that TW did not seize the second chance the juvenile court offered him during the period from June 3, 2016 to March 28, 2017. During that time, he was sent to the State Penitentiary because of both his parole violation and an escape sentence that would keep him there until, at the earliest, some unspecified time in 2018. Then TW's misconduct resulted in his being placed in "lockdown" for violating prison rules shortly before a prearranged contact visit with his young sons, and throughout his stay in Rawlins he communicated with the boys only occasionally.
[¶26] TW also took little to no advantage of the rehabilitative services available to him at the penitentiary. His DFS and prison caseworkers attempted to collaborate so that most services DFS could have provided if he had not been incarcerated could be provided by the Department of Corrections while he was at the penitentiary. Although live parenting classes were not available at the prison, DFS arranged for him to complete those classes through the mail, and it sent him written course materials to complete. However, he never enrolled in any substance abuse or mental health programs available to him, and he declined to undergo any substance abuse or psychological evaluations unless DFS paid for them. Moreover, he claimed that mental health issues, about which he had previously complained, suddenly (and perhaps miraculously given his background) were no longer problematic. Finally, he never even signed a release so that his prison caseworker could keep DFS apprised of the progress he was making on his case plan while incarcerated.
[¶27] Not surprisingly, the juvenile court determined that TW had not pursued the opportunities for rehabilitative services and communication with his sons that were available to him at the penitentiary, and that he wanted to place the blame for that inaction on DFS, rather than accept the consequences of his own lack of effort and cooperation. Applying the standards set out above, we conclude that the juvenile court's determination was amply supported by the record, and that the juvenile court properly determined that DFS made reasonable efforts to supply TW with such services as might enhance his chances at reunification with his sons. He simply did not avail himself of them, and those efforts were therefore unsuccessful.
CONCLUSION
[¶28] The juvenile court's decision to alter the permanency plan from family reunification to termination of TW's parental rights and adoption is affirmed.

Well into 2015, Mother could not be served because her whereabouts were unknown, and the State believed she had left Wyoming.

DFS caseworker Dena Knox advised the court that she had informed TW about the hearing by telephone and had e-mailed a copy of the court's order to appear to TW's case manager at the Casper corrections facility.

Counsel was appointed for him on December 28, 2015.

This Court affirmed the adjudication of neglect in TW v. State , 2017 WY 26, 390 P.3d 357 (Wyo. 2017).

Such a return was in fact impossible. Neither parent had a home, Mother was somewhere in another state and had not responded to attempts by DFS or her attorney to contact her, and TW was incarcerated and facing new felony charges.

TW has little education or work experience and has been incarcerated for most of the lives of his sons.

Under Wyo. Stat. Ann. § 14-3-431(d) (LexisNexis 2017), such a hearing must be held within twelve months of removing a child from the parents' home, and thereafter at no longer than 12-month intervals.

This rule extends to parents who are imprisoned and therefore cannot obtain services directly from the DFS, but who have comparable services available to them through a corrections authority. See In re Doe , 100 Hawai'i 335, 60 P.3d 285, 295 (2002) ; In re M.T. , 613 N.W.2d 690, 692 (Iowa Ct. App. 2000) (both holding that any limitation on the scope of services is attributable not to DFS, but to the parent's criminal behavior).