# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 128

OCTOBER TERM, A.D. 2022

October 17, 2022

IN THE INTEREST OF: BP and CS,
minor children,

NP,

Appellant
(Respondent),

v.                                                          S-22-0073

THE STATE OF WYOMING,

Appellee
(Petitioner).

*Appeal from the District Court of Laramie County*
*The Honorable Peter H. Froelicher, Judge*

**Representing Appellant:**

Melissa R. Theriault, Woodhouse Roden Ames & Brennan, LLC, Cheyenne, Wyoming. Argument by Ms. Theriault.

**Representing Appellee:**

Bridget Hill, Wyoming Attorney General; Misha Westby\*, Deputy Attorney General; Christina F. McCabe, Senior Assistant Attorney General; Wendy S. Ross, Senior Assistant Attorney General. Argument by Ms. Ross.

**Guardian ad Litem:**

Joseph R. Belcher, Director, Wyoming Office of Guardian ad Litem; Kimberly Skoutary Johnson, Chief Trial and Appellate Counsel.

**Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.**

\* An Order Allowing Withdrawal of Counsel was entered on July 26, 2022.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    The Department of Family Services (DFS) recommended changing the permanency plan for minor siblings BP and CS from reunification to adoption.  The juvenile court held an evidentiary hearing after which it ordered the permanency plan be changed to adoption.  NP (Mother) appeals and we affirm.

## ISSUE

[¶2]    Did the juvenile court abuse its discretion when it found that DFS made reasonable efforts to reunify Mother with her children and changed the permanency plan from reunification to adoption?

## FACTS

[¶3]    Mother, CS (age 13), and BP (age 10)[1] have a long history with child protection agencies, starting in 2008, when a neglect case against Mother was opened in Colorado (CS was less than one year old at the time) and continuing through the present Wyoming case.  This case commenced on February 4, 2021, when the Laramie County District Attorney's office filed a petition alleging Mother neglected her children.  At that time, Mother was incarcerated in Albany County, Wyoming.  Her incarceration resulted from a vehicle pursuit that began in Colorado, when Mother, with her two younger children in her car, allegedly shot at a police officer, and then fled.  The pursuit ended in Albany County, Wyoming, where Mother was arrested.[2]  At some point after Mother's arrest, CS and BP were being cared for by one of Mother's friends in Laramie County.  An emergency hearing to address custody of CS and BP was held in February 2021.  The juvenile court placed the children in the legal and physical custody of DFS for placement in foster care.  Approximately a month later, the juvenile court found the children were neglected by Mother.

[¶4]    In March 2021, DFS developed a case plan for the family.  The case plan identified five areas for Mother to address: sobriety, a healthy support system, health care for the children, mental health, and parenting education.  For each of those areas, the plan set forth discrete tasks for Mother to complete.  Those tasks included:

- Attending and participating in sobriety groups while incarcerated then obtaining documentation of her attendance and mailing it to DFS monthly;

---

[1] Mother has two other children, BN and DN.  Those children came into DFS custody in Albany County based on the same conduct underlying this case.  Their case is the subject of a companion appeal, *Interest of: BN & DN*, 2022 WY ---, --- P.3d --- (Wyo. 2022) (S-22-0071).

[2] BN and DN were taken into protective custody in Albany County.

1

- Working with DFS to obtain written resources, if sobriety groups were unavailable due to COVID-19, and detailing learning in monthly reports to DFS;
- Participating in drug testing after release to demonstrate sobriety;
- Working with DFS to identify supportive people in her life;
- Working with a therapist to identify characteristics of healthy, supportive relationships;
- Establishing primary care physicians, eye doctors, and dentists for CS and BP;
- Participating in individual therapy, beginning by July 1, 2021, and signing a release of information to DFS;
- Attending and participating in family therapy with CS when recommended by CS's therapist;
- Attending and participating in family therapy with BP when recommended by BP's therapist; and
- Working with DFS caseworker to obtain parenting education materials and writing a monthly letter detailing what she learned.

[¶5]   In early April 2021, DFS completed and filed a Predisposition Report (PDR). The PDR summarized Mother's history of mental health issues, substance abuse, and law enforcement contacts. The PDR explained that "[w]ithout medication it seems based on [Mother's] history she struggles with maintaining appropriate relationships, maintaining steady employment, substance abuse, . . . and has racing thoughts and manic behaviors." The PDR lists thirty-two law enforcement contacts with Mother between February 2007 and April 2018. Of those, ten related to domestic abuse, child abuse and neglect, or child endangerment. The remaining contacts referenced substance abuse, harassing conduct, and theft.

[¶6]   The PDR also summarized Mother's history of contact with child protection agencies. Those contacts began in November 2008, when Mother was referred to Colorado Child Protective Services for methamphetamine use, exposing eleven-month-old CS to drugs, and using Tylenol and Benadryl to sedate CS, causing him to sleep up to twenty hours per day. From 2008 to the present, there were approximately twenty-three child welfare reports related to Mother's substance abuse, abuse and neglect of the children, domestic violence, criminal behavior, and mental health. Some of those reports resulted in the removal of CS and BP from Mother's care. In Colorado, CS was removed from Mother's care in 2008. CS and BP were removed again in 2012 and remained in the custody of Colorado Child Protective Services through 2013, when the children were placed in a permanent guardianship.[3] In November 2016, a review hearing was held in Colorado to consider a change of permanency plan to termination and adoption. At that hearing, the Colorado court placed the children with another friend of Mother's in

---

[3] The record is devoid of details of the guardianship and does not reference its current status.

Wyoming.[4]  The children moved to Wyoming.  Subsequently, two cases were opened.  All four children were in foster care from November 2016 through November 2017, and again from March 2018 through early 2020.  Both times, Mother substantially complied with her case plan and all four children were returned to her care.

[¶7]    When the case at issue here was opened, DFS recommended a permanency plan of adoption.  This recommendation stemmed from Mother's current criminal charges and her history with law enforcement and child protective services.  After a disposition hearing in May 2021, the juvenile court rejected DFS' recommendation, ordered a permanency plan of reunification, and adopted the recommendations of the case plan.

[¶8]    Multidisciplinary team (MDT) meetings were held in March, June, July, and October 2021.  At these meetings, DFS noted Mother made progress on aspects of her case plan.  Mother's comments at MDT meetings were often "erratic and hard to follow."  At each of these meetings, DFS and the Guardian ad Litem recommended the permanency plan be changed to adoption.  Mother disagreed, each time recommending the plan remain reunification.

[¶9]    Mother completed an Addiction Severity Index (ASI) evaluation in March 2021.  The ASI recommended Mother complete a psychiatric evaluation and receive treatment for substance abuse.  Mother was placed on a waiting list for an inpatient substance abuse treatment facility.

[¶10]   In May 2021, Mother was found incompetent to proceed to trial in the criminal case.  She was admitted to the Wyoming State Hospital for inpatient psychiatric treatment to restore competency.[5]  Mother engaged in some mental health treatment and therapy groups while at the Wyoming State Hospital.

[¶11]   At the November 2021 permanency hearing, Mother's DFS caseworker testified that Mother had completed the parenting education materials DFS had sent her, and she continued to participate in therapy at the Wyoming State Hospital.  She also testified that Mother's incarceration was an obstacle to completion of the remaining tasks.  Mother had not completed inpatient sobriety treatment, established a healthy family support system, or found primary care providers for her children.  She had not participated in family therapy with the children—the children's therapists had recommended against it.  Mother's caseworker explained, "the amount of time that she will spend incarcerated is a big unknown right now . . ." and testified Mother's current status of "being detained in Albany [County] and then placed [in] the state hospital" is a barrier to achieving reunification.

---

[4] This hearing and placement were conducted under the Interstate Compact on the Placement of Children.  Nothing in the record indicates how or why the children were placed with Mother's friend.
[5] Mother was diagnosed with "unspecified schizophrenia spectrum and other psychotic disorders" and was placed on antipsychotic and antianxiety medications at the Wyoming State Hospital.

Mother's caseworker also expressed reservations about Mother's ability to manage her mental health and medications when not incarcerated. She was concerned with the family's extensive history with child protection services. At the time of the hearing, CS had spent approximately forty-three months in foster care, and BP approximately thirty-four months. She testified that she did not believe Mother could provide a safe home for the children and that adoption was in the children's best interests.

[¶12]  Both CS and BP testified that they wish to be adopted and would prefer not to see their mother.[6]

[¶13]  Mother's only witness was Dr. Anthony Delmonte, her psychiatrist at the Wyoming State Hospital. Dr. Delmonte testified that Mother was compliant with her medication treatment and was attending individual and group therapies. He testified that initially it was "difficult to have a conversation with" Mother, but by the time of the hearing, he could have productive conversations with her. Dr. Delmonte also testified that Mother would likely need to stay on her medication, and she may require treatment for the rest of her life. At the end of the hearing, the juvenile court took the matter under advisement.

[¶14]  On November 29, 2021, the juvenile court issued its oral ruling and subsequently issued a written order changing the permanency plan to adoption and relieving DFS from further reunification efforts. Mother timely appeals.

### STANDARD OF REVIEW

[¶15]  "We review the juvenile court's decision to change a permanency plan for an abuse of discretion." *Int. of AM*, 2021 WY 119, ¶¶ 8–9, 497 P.3d 914, 918 (Wyo. 2021) (citing *Int. of: AA*, 2021 WY 18, ¶ 33, 479 P.3d 1252, 1261 (Wyo. 2021)). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances." *Id.* ¶ 9, 497 P.3d at 918 (quoting *AA*, ¶ 33, 479 P.3d at 1261). When a parent challenges the sufficiency of the evidence to support the juvenile court's decision, "we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party." *Id.* (quoting *Matter of JPL*, 2021 WY 94, ¶ 21, 493 P.3d 174, 180 (Wyo. 2021)).

### ANALYSIS

[¶16]  When the permanency plan is reunification, "the Department must make reasonable efforts to 'eliminate the need to remove the child[ren] from the home, or to make it possible

---

[6] At MDT meetings, CS consistently indicated that he did not want to reunify with Mother and that he preferred to not have any contact with her. BP indicated that he did not want to live with Mother but had different opinions throughout the case as to whether he would like contact with her.

4

for the child[ren] to safely return' home." *Int. of MA*, 2022 WY 29, ¶ 29, 505 P.3d 179, 186 (Wyo. 2022) (quoting *AM*, ¶ 15, 497 P.3d at 920 (citing Wyo. Stat. Ann. § 14-3-440(a))). Pursuant to Wyo. Stat. Ann. § 14-3-431(k)(i), the juvenile court must assess the DFS' efforts at permanency hearings, and it must determine "whether the permanency plan is in the best interest of the child and whether the [DFS] has made reasonable efforts to finalize the plan[.]" The statutes do not define reasonable efforts, but we have held that the juvenile court's "[r]easonable efforts determination[] shall include whether or not services to the family have been accessible, available and appropriate," *Int. of SW*, 2021 WY 81, ¶ 20, 491 P.3d 264, 270 (Wyo. 2021) (quoting Wyo. Stat. Ann. § 14-3-440(e)), and whether efforts were "tailored to the distinct circumstances of each case." *MA*, ¶ 30, 505 P.3d at 186. "[T]o demonstrate that its efforts were reasonable, [DFS] must make clear the reasons that necessitated the out of home placement in the first place, and then show how its efforts were directed at remedying those reasons." *Id.* At the same time, the juvenile court must evaluate the DFS' efforts on a "case-by-case basis, taking into consideration the totality of the circumstances." *Id.* ¶ 31, 505 P.3d at 186 (citing 1 Thomas A. Jacobs, *Children and the Law: Rights and Obligations* § 3:10, Westlaw (database update May 2021); *SW*, ¶ 20, 491 P.3d at 270).

[¶17] To change a permanency plan, the State must prove by a preponderance of the evidence that the current plan is not in the child's best interests and that DFS has made reasonable, but unsuccessful, efforts to finalize the plan. Wyo. Stat. Ann. § 14-3-431(k)(i); *AM*, ¶ 11, 497 P.3d at 918; *SW*, ¶ 17, 491 P.3d at 269; *In Int. of JW*, 2018 WY 22, ¶ 19, 411 P.3d 422, 426 (Wyo. 2018) ("to change a permanency plan from one aimed at family reunification to one directed toward adoption, the DFS must show that it made reasonable efforts to achieve unification without success"). "If the juvenile court determines the State has met its burden, it may order a change in the permanency plan." *AM*, ¶ 11, 497 P.3d at 918 (citing *SW*, ¶ 17, 491 P.3d at 269).

[¶18] Here, the juvenile court found that DFS established it had made reasonable efforts to reunify the family, stating DFS had "done as much as [it] can at this point based upon the current status of the case and [the] current status of [Mother's criminal matter]," and determined that adoption is in the best interests of CS and BP. Mother does not contest the juvenile court's findings regarding CS's and BP's best interests. Rather, she contends that the juvenile court abused its discretion when it found that DFS made reasonable efforts to reunify her with her children. Mother argues that DFS' efforts were not "accessible, available and appropriate." *See SW*, ¶ 20, 491 P.3d at 270. We find that the juvenile court did not abuse its discretion when it determined DFS made reasonable, albeit unsuccessful, efforts to reunite CS and BP with Mother.

[¶19] The "reasonableness" of the DFS' efforts must be assessed in the context of each case. *In re DRS*, 2011 WY 128, ¶ 33, 261 P.3d 697, 706 (Wyo. 2011) ("Reasonable efforts are determined on a case-by-case basis."). Here, from the inception of the case, Mother was incarcerated or at the Wyoming State Hospital and, at the permanency hearing, the

5

duration of her incarceration was unknown. A parent's incarceration does not relieve DFS of its obligation to make efforts to finalize the permanency plan, even a plan of reunification. *See JW*, ¶ 26, 411 P.3d at 427 (finding reasonable efforts where DFS adapted its efforts after father went to prison in order to assist him in working toward his case objectives); *In re FM*, 2007 WY 128, ¶¶ 12–14, 163 P.3d 844, 848 (Wyo. 2007) (DFS did not establish reasonable efforts to reunify when it did not update the case plan after mother went to jail and when it made no attempts to facilitate contact once mother was incarcerated.).

[¶20]   At the beginning of this case, DFS identified the family's needs to include individual therapy, family therapy, sibling therapy, substance abuse treatment, and parenting education. In accordance with the juvenile court's order requiring reunification efforts, DFS made efforts to address the family's needs and reunify, including:

- Referring Mother for a substance abuse evaluation (ASI), which was completed in March 2021;[7]
- Offering to work with Mother to find sobriety support groups while incarcerated (or to obtain written materials if groups were not available);
- Referring Mother for counseling services and accepting her counseling at Wyoming State Hospital as satisfying this requirement;[8]
- Obtaining psychiatric evaluations of and counseling for the children;
- Searching for a male therapist for CS;
- Involving Mother in treatment decisions for the children;
- Providing Mother with parenting education materials and receiving her completion reports via Mother's attorney;
- Meeting regularly with Mother about the case, her progress, and facilitating monthly family team meetings and MDT meetings;
- Attempting to locate CS's and BP's fathers; and
- Providing Mother's partner with a foster care application (as requested by Mother), which was ultimately denied, and then facilitating visits between the children and Mother's partner.

[¶21]   DFS was simultaneously making efforts and providing services to Mother in a separate Albany County case. *See Interest of: BN & DN*, 2022 WY ---, --- P.3d --- (Wyo. 2022) (S-22-0071). Both Wyoming and Colorado have provided reunification services to Mother. The prior Wyoming cases were initiated in 2016 and 2018. In November 2016, a

---

[7] The ASI recommended a psychiatric evaluation and inpatient treatment services. Mother was accepted at a treatment facility and was placed on its waitlist pending her release from incarceration.

[8] It was in the context of her criminal matter that Mother was found incompetent to stand trial and was placed at the Wyoming State Hospital where she was diagnosed and treated for schizophrenia. That diagnosis had not been made during evaluations in her other DFS and out-of-state child protective services interactions.

neglect proceeding was commenced and all four of Mother's children were placed in protective custody until January 2018, when the family was reunited after fifteen months of efforts. Just two months later, in March 2018, law enforcement again took protective custody of the children after Mother left the children without a caretaker. Shortly thereafter, independent of the events that led to this case, Mother was involved in a vehicle pursuit with law enforcement which led to her arrest. The neglect case arising from those incidents remained open until March 2020, when Mother was again reunited with the children. By the end of September 2021, CS and BP had been placed in Wyoming DFS custody three times. DFS had made three different attempts to reunify the family and had expended more than $190,000 providing services to the family. By any account, DFS' efforts have been substantial.

[¶22] Mother argues that DFS' efforts were not "accessible, available and appropriate." *See SW*, ¶ 20, 491 P.3d at 270. She relies on *MA*, ¶¶ 30–31, 505 P.3d at 186.

[¶23] Mother asserts that, as in *MA*, DFS' efforts failed because they did not address the underlying reasons for the conduct leading to her arrest, and DFS failed to tailor its efforts to address Mother's mental health issues.[9] In *MA*, we found DFS "provided minimal, informational assistance and was inflexible and disengaged from Mother and her unique circumstances." *MA*, ¶ 33, 505 P.3d at 187. Mother's reliance on *MA* is out of context. In *MA*, there were no allegations of abuse or neglect against the mother, and DFS never set forth its reasons for removing the children from the mother's home. *Id.* ¶¶ 32–33, 505 P.3d at 187. Among other paucities, DFS did not assist the mother with enrolling in parenting or counseling services. Its efforts consisted of providing "one list of providers and a handful of reminders." *Id.* ¶ 35, 505 P.3d at 188. While in *MA*, we found of "particular concern . . . the lack of evidence from the Department that it considered how Mother's mental health affected her ability to comply with the court ordered requirements," *id.* ¶ 36, 505 P.3d at 188, this was one factor which cannot be viewed in isolation. The mother in *MA* enrolled in and attended counseling. She communicated with her caseworker, attempted visitation, and attended parenting classes. In these efforts, she received little to no assistance from DFS. *Id.* ¶¶ 37–48, 505 P.3d at 188–90. On review of the entire record, we concluded that DFS "failed to show that it tailored its efforts to Mother's unique circumstances." *Id.* ¶ 36, 505 P.3d at 188.

[¶24] As detailed in the preceding paragraphs, here, in contrast to *MA*, Mother was adjudicated neglectful. She received extensive services (from Wyoming DFS and from child protective services in other states) over a period of twelve years. *See In Int. of JG*,

---

[9] To the extent Mother argues that to meet its statutory requirement to provide reasonable efforts to reunify the family DFS had to obtain a diagnosis of and treatment for schizophrenia, we disagree. Over the years, and in this case, DFS required Mother to obtain mental health evaluations and to seek therapy. DFS has no obligation to second guess diagnoses made by professionals.

742 P.2d 770, 773–74 (Wyo. 1987) (Trial court could rely upon evidence of unsuccessful rehabilitative efforts in Oklahoma to terminate parental rights of father.).

[¶25] In her current case, these services include parenting education using a book and reporting in lieu of classes, and recommended counseling which Mother received at the Wyoming State Hospital. DFS provided services to CS and BP including counseling. Despite these efforts, CS's and BP's counselors did not recommend contact with Mother. Both CS and BP testified they did not want to return to Mother. It appears DFS provided all the services that it could, given Mother's incarceration, her hospitalization, and the children's status. What is reasonable must take into account Mother's incarceration and what services are available under the circumstances. *See JW*, ¶ 21, 411 P.3d at 426 n.8 (citing *In re Doe*, 60 P.3d 285, 295 (Haw. 2002); *In re M.T.*, 613 N.W.2d 690, 692 (Iowa Ct. App. 2000) (both holding that any limitation on the scope of efforts is attributable not to DFS, but to the parent's criminal behavior and subsequent incarceration)). In the context of Mother's long history with child protective services in Colorado and Wyoming and her incarceration, the juvenile court did not abuse its discretion when it concluded DFS made reasonable efforts to reunify Mother with CS and BP.

[¶26] We affirm.