# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 146

**OCTOBER TERM, A.D. 2022**

November 22, 2022

IN THE INTEREST OF:  BN and DN, minor
children,

NP,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-22-0071

*Appeal from the District Court of Albany County*
*The Honorable Tori R.A. Kricken, Judge*

***Representing Appellant:***

Melissa R. Theriault, Woodhouse Roden Ames & Brennan, LLC, Cheyenne, Wyoming.

***Representing Appellee:***

Bridget L. Hill, Attorney General; Misha Westby*, Deputy Attorney General; Christina F. McCabe, Senior Assistant Attorney General; Wendy S. Ross, Senior Assistant Attorney General. Argument by Ms. Ross.

***Guardian ad Litem Program:***

Joseph Belcher, Director, and Kim Skoutary-Johnson, Chief Trial and Appellate Counsel, Wyoming Office of the Guardian ad Litem.

***Before FOX, C.J., KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.***

*An Order Allowing Withdrawal of Counsel was entered July 26, 2022.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    NP (Mother) appeals the juvenile court's order changing the permanency plan for her and her two youngest children from family reunification to adoption.  Mother asserts the juvenile court abused its discretion when it determined the Department of Family Services (DFS) made reasonable, but unsuccessful, efforts to reunify the family without specifically tailoring their efforts to Mother's mental health needs.  We affirm.

*ISSUE*

[¶2]    Mother raises one issue on appeal, which we rephrase:

>  Whether the juvenile court abused its discretion when it found
>  DFS made reasonable efforts at reunification and the
>  permanency plan for the children should be changed to
>  adoption.

*FACTS*

**Background and Proceedings**

[¶3]    This matter involves Mother and her two children, BN and DN (born in 2015 and 2014, respectively).[1]  Mother has a significant history of child endangerment across Wyoming, Colorado, and Utah, as well as a significant history of substance abuse.  DFS first took BN and DN into protective custody in 2016 when Mother was arrested after fleeing from police in her vehicle with the children inside.  The children have been in and out of protective custody since that time.

[¶4]    This case began on January 20, 2021, when police officers in Colorado received a tip about a possible child kidnapping.  The officers made contact with Mother, who then allegedly shot at the officers and fled the scene in a vehicle.  The officers followed in pursuit.  Mother fled from Colorado into Albany County, Wyoming with both children seated in the vehicle.  Mother drove at high rates of speed to elude the officers and drove into oncoming traffic to avoid tactical vehicle intervention. The officers eventually stopped Mother's vehicle, arrested her, and took BN and DN into protective custody.  The State charged Mother with numerous felonies and misdemeanors.

[¶5]    On January 22, 2021, the State filed a neglect petition against Mother.  In addition to describing the above incident, the petition indicated Mother was subject to an active

---

[1] Mother has two older children whose status we addressed in a companion appeal.  *See Int. of BP & CS*, 2022 WY 128, 518 P.3d 698 (Wyo. 2022).  The juvenile proceedings underlying this case involve only Mother because the father of BN and DN passed away in 2017.

protection order which prohibited her from contacting the children due to a DUI criminal offense in Colorado.

[¶6] The juvenile court held a shelter care hearing the same day the petition was filed. Mother appeared and the court entered a denial of the allegations on her behalf. The court placed the children in DFS custody for placement in foster care. The court also ordered Mother to submit to a substance abuse and mental health evaluation; comply with the examiner's recommendations; and comply with random urinalysis testing. The court permitted Mother to have visitation with the children by letter or telephone at the discretion of DFS and the guardian ad litem.

[¶7] On March 23, 2021, Mother plead no contest to the neglect petition. The juvenile court found she neglected the children and ordered DFS to prepare a predisposition report (PDR). It also ordered Mother to undergo a substance abuse evaluation. After DFS' referral, Mother completed an Addiction Severity Index (ASI) and then applied to an inpatient substance abuse treatment facility in Sheridan. In the context of her criminal case, the district court ordered Mother to be evaluated by the Wyoming State Hospital to assess her competency to proceed to trial. Mother was eventually admitted to the Wyoming State Hospital for inpatient psychiatric treatment.[2]

[¶8] On May 12, 2021, the State filed the PDR. It contained a detailed history of Mother's neglect of BN and DN, along with her extensive criminal history. It indicated the children had been subjected to significant neglect and abuse for most of their lives while in Mother's care. Between 2016 and 2020, Mother's criminal history included at least seven instances of law enforcement contacts related to child neglect, abuse, or abandonment, and one contact involving a DUI with children in the car. Mother's criminal history also involved, among other crimes, drug possession, domestic violence, theft, and assault.

[¶9] The PDR set forth Mother's history with child protective services with BN and DN. The PDR indicated DFS took all four of Mother's children into protective custody in November 2016 after her arrest for domestic violence and evading police in a vehicle with the children present. DFS had BN and DN placed in foster care from November 2016 through January 2018, and again from March 2018 through March 2020. Reunification was achieved in each prior case when Mother substantially completed her case plans. The PDR noted the children's current removal from Mother was the third time in five years and they have spent the majority of their lives in DFS custody.

---

[2] On May 13, 2021, the Wyoming State Hospital found Mother incompetent to proceed to trial in the criminal matter. In December, the district court found Mother's competency had been restored but kept the criminal proceedings suspended for further evaluation due to Mother's plea of not guilty by reason of mental illness or deficiency. Mother was still being held at the Wyoming State Hospital during the permanency hearing in January 2022, *see infra* ¶¶ 21–22.

[¶10] The juvenile court held a disposition hearing on May 20, 2021. In its order following the hearing, the court determined the permanency goal for the children would be family preservation with a concurrent goal of adoption. The court ordered Mother to utilize any and all programs while she was incarcerated to address substance abuse, parenting, trauma, and corrective thinking; "[f]ollow the recommendations of her ASI"; "[p]articipate in a parental capacity screening if deemed appropriate by her therapist"; and "seek individual counseling . . . as much as she is able[.]" The court further ordered Mother's visitation with the children would be by letter and any other visitation would "be at the discretion of the [DFS], Guardian *ad Litem*, and in consultation with therapists of [BN and DN], and conducted in a therapeutic setting."

### Reunification Efforts

[¶11] DFS developed and filed the first case plan for the current juvenile proceedings related to BN and DN in March 2021. Mother's DFS caseworker attempted to confer with Mother on the details of the case plan while she was incarcerated but she refused to cooperate. Mother did not sign the case plan.

[¶12] The unsigned first case plan, filed prior to the juvenile court's disposition order, listed family reunification as the permanency goal, with a concurrent permanency plan of adoption or guardianship. It identified several areas for Mother to focus on, such as "be[ing] free from incarceration," "be[ing] sober and mentally stable," and being able to "provide prudent, safe, non-harmful and reasonable parenting to her children." It also listed tasks for her to complete to accomplish the plan's goals. Those tasks included:

- Serve and complete terms of felony and misdemeanor convictions in Wyoming and Colorado;

- "Serve and complete probation revocation from Cheyenne, WY";

- "Follow terms of probation, parole, or bond conditions";

- "Recognize and address substance abuse/use";

- "Identify and begin participation in drug treatment program while incarcerated";

- "Complete drug treatment program while incarcerated";

- "Enroll in after care drug treatment program, such as an IOP program as recommended by the team, therapist, or program manager";

- "Participate fully in random UAs upon release from incarceration at DFS or program discretion";

- "Receive psychiatric evaluation";

- "Receive mental health evaluation and follow recommended treatment and therapy for mental health needs";

- "Take all prescribed medications regularly";

- "Identify and accept[] responsibility for what actions have caused her children trauma by creating list with therapist";

- "Participate [in] and complete [] any parenting program, class, or workbook offered while incarcerated";

- "Complete a parenting capacity assessment with Dr. Turlington upon release and follow recommendations of such assessment"; and

- "Work diligently and successfully with WRAP program upon release to establish safe and appropriate boundaries and communication with children."

[¶13] The DFS caseworker met monthly with Mother at the detention center and noted that Mother needed "significant mental health support." The caseworker regularly encouraged Mother to get a therapist and an evaluation so she could begin to work on her mental health. Mother declined the caseworker's suggestions saying she could not receive those services in the detention center. The caseworker stressed that DFS could connect Mother with a therapist to provide mental health support while she was at the detention center, but Mother insisted on waiting until she was at the Wyoming State Hospital to receive any mental health treatment.

[¶14] DFS offered Mother several other services: the "Love and Logic" parenting workbook, "classes through parents as teachers," and parenting books. DFS also initially gave Mother the option to have video visits with the children. Mother refused to accept these services.

4

[¶15]   Following the disposition hearing, the DFS caseworker again met with Mother to update the case plan.  Mother felt the case plan had several inaccuracies related to her criminal and factual background.  Mother also requested DFS provide her with a Native American spiritual book on parenting, which DFS could not find.  Mother did not sign the case plan.  As filed with the juvenile court, the unsigned second case plan listed the same goals and tasks as the previous plan but contained handwritten notes indicating drug treatment programs were not available at the detention center, Mother's competency evaluation would be performed at the Wyoming State Hospital, and Mother would get a parental capacity assessment only if it was recommended by a therapist.

[¶16]   The DFS caseworker requested Mother write letters to BN and DN, which DFS, the guardian ad litem, or the children's therapists would review and edit before giving them to the children.  Between March and June, Mother wrote two letters to BN and DN.  She was discouraged when they did not write back.  In June, the caseworker encouraged Mother to continue writing letters even if the children did not respond.  Mother then wrote over 30 letters to BN and DN.  DFS withheld about half of those letters because their content was age-inappropriate.   The inappropriate letters included statements about Mother's experience of sexual abuse, conspiratorial statements that she believed the children were being turned against her and groomed to favor adoption, and that many agencies were tracking her and the children and were dangerous.

[¶17]   By September, BN had been in therapy and shown positive progress, but DN's behavior deteriorated over the summer and the children were separated after DN exhibited inappropriate sexual behavior and violence towards his sister.  DFS helped obtain a psychiatric evaluation for DN and then facilitated his placement into residential treatment based on the recommendations of the evaluation.  BN remained in foster care placement.

[¶18]   By late November, the DFS caseworker worked with Mother to prepare a third case plan.  Mother had been receiving treatment at the Wyoming State Hospital and was more cooperative with DFS.  The third case plan required Mother to focus on: resolving her criminal charges, providing safe parenting to her children by improving her mental health, demonstrating ongoing sobriety, and operating a vehicle safely.  Mother signed the updated case plan but made several handwritten edits indicating she did not have a substance abuse problem, had not been neglectful or abusive to her children, and would not see a therapist.

[¶19]   Between May 2021 and January 2022, the State filed four multidisciplinary team (MDT) meeting reports prepared by DFS.  The first three reports discussed significant issues with Mother's willingness and ability to follow the case plans and noted her many refusals to cooperate with DFS.  Mother refused to receive any mental health treatment, including therapy, prior to being sent to the Wyoming State Hospital.  Mother was also uncooperative with DFS in releasing her treatment information once she was a patient at the Wyoming State Hospital.  The reports noted Mother's lack of understanding of her role in endangering and traumatizing her children and her refusal to take accountability.  From

the outset, DFS and the guardian ad litem recommended the permanency plan be changed to adoption. The county attorney initially recommended DFS continue reunification efforts but later changed her permanency plan recommendation to adoption.

[¶20] The State filed the fourth, and final, MDT meeting report in January 2022 prior to the permanency hearing. The report noted Mother had provided DFS access to some of her treatment information and was voluntarily working with DFS. The Wyoming State Hospital diagnosed Mother with "unspecified schizophrenic spectrum and other psychotic disorder." The report further noted Mother had asked why the abuse and neglect case was opened, and she did not appear to comprehend the nature of the allegations against her and the impact of her alleged criminal activity on the children. The entire MDT, except Mother and her counsel, recommended changing the permanency plan to adoption.

### Permanency Hearing

[¶21] The juvenile court held the permanency hearing in January 2022. It heard testimony from two witnesses: the DFS caseworker and Lisa Theis, the children's foster parent. The State also introduced four exhibits, which included the three case plans and a summary of Mother's letters to the children. Mother presented no evidence but cross-examined the State's witnesses. The guardian ad litem also presented no evidence but cross-examined the DFS caseworker.

[¶22] The caseworker testified to his efforts to engage Mother in the services offered by DFS, as discussed above. He also testified to Mother's minimal progress and repeated refusals to cooperate, along with Mother's struggles with mental health and substance abuse. The caseworker stated that after learning about Mother's mental health diagnosis and looking back on the case, he did not think he "would have done a whole lot different[.]" He further testified there was no clear timeline when Mother would be released from her psychiatric placement or from incarceration, as Mother was facing felony and misdemeanor criminal proceedings in both Wyoming and Colorado. He stated that Mother could not provide a consistent stable home environment to the children and that the children on multiple occasions expressed their desire to be adopted. For these reasons, the caseworker opined adoption was in the children's best interest.

[¶23] Ms. Theis testified to her interactions with the children while in her care. She testified the children were extremely difficult at first and displayed behaviors indicating past trauma such as fear for their safety and food insecurity. She stated both children often told her they did not want to live with Mother again. Ms. Theis also testified about the progress both children made while in her care.

[¶24] At the close of the hearing, the State argued DFS had made reasonable, but unsuccessful, efforts to reunify Mother with BN and DN and therefore should be relieved of that obligation, and it was in the best interest of the children to change the permanency

6

plan to adoption. The guardian ad litem agreed with the State, arguing the children need stability, Mother continues to defer responsibility, and Mother refuses to acknowledge that her actions traumatized her children.

[¶25] The juvenile court issued its order the next day. The court determined the evidence made clear DFS had made reasonable efforts at reunification without success and it was in the best interest of both children for the permanency plan to change to adoption. Mother appealed.

## STANDARD OF REVIEW

[¶26] The juvenile court may order a permanency plan be changed from family reunification to adoption if it finds DFS "made reasonable efforts to achieve reunification without success and that reunification is no longer in the children's best interest." *Int. of MA*, 2022 WY 29, ¶ 25, 505 P.3d 179, 185 (Wyo. 2022) (quoting *Int. of RR*, 2021 WY 85, ¶ 97, 492 P.3d 246, 270 (Wyo. 2021)). We review the court's reasonable efforts finding for an abuse of discretion. *Id.* (citing *RR*, ¶ 98, 492 P.3d at 270–71). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances." *Int. of AM*, 2021 WY 119, ¶ 9, 497 P.3d 914, 918 (Wyo. 2021) (quoting *Int. of: AA*, 2021 WY 18, ¶ 33, 479 P.3d 1252, 1261 (Wyo. 2021)).

[¶27] DFS had the burden at the permanency hearing to prove it made reasonable efforts to reunify Mother with her children. *MA*, ¶ 26, 505 P.3d at 185 (citing *AM*, ¶ 15, 497 P.3d at 920). "On appeal, we must look at whether the court's determination that [DFS] met its burden was reasonable and supported by a preponderance of the evidence." *Id.* (citing *RR*, ¶ 98, 492 P.3d at 270–71). In reviewing the sufficiency of the evidence:

> [W]e defer to the juvenile court's judgment, examining all evidence in the light most favorable to the State and resolving all evidentiary conflicts in its favor. We assume all of its evidence is true and disregard any contrary proof adduced by the parent challenging the juvenile court's decision.

*Id.* ¶ 27, 505 P.3d at 185–86 (quoting *RR*, ¶ 98, 492 P.3d at 271).

## DISCUSSION

[¶28] In neglect cases, Wyo. Stat. Ann. § 14-3-440(a) requires DFS to "make reasonable efforts to 'preserve and reunify the family[.]'" *Id.* ¶ 29, 505 P.3d at 186 (quoting *Int. of SW*, 2021 WY 81, ¶ 19, 491 P.3d 264, 270 (Wyo. 2021)); Wyo. Stat. Ann. § 14-3-440(a) (LexisNexis 2021). DFS' reasonable efforts must be aimed at preventing or eliminating the need for removing the children from their home and making it possible for the children to safely return home. Wyo. Stat. Ann. § 14-3-440(a); *MA*, ¶ 29, 505 P.3d at 186 (citing

*AM*, ¶ 15, 497 P.3d at 920). The health and safety of the children are the paramount consideration in determining what efforts are required. Wyo. Stat. Ann. § 14-3-440(b); *SW*, ¶ 19, 491 P.3d at 270. As such, the "timely placement of children in accordance with a permanency plan may take precedence over family reunification, and reunification efforts inconsistent with the permanency plan may be discontinued." *SW*, ¶ 19, 491 P.3d at 270 (quoting *Int. of VS*, 2018 WY 119, ¶ 43, 426 P.3d 14, 26 (Wyo. 2018)).

[¶29]  Whether DFS made reasonable efforts is "determined on a case-by-case basis." *Id.* ¶ 20, 491 P.3d at 270 (quoting *In re DRS*, 2011 WY 128, ¶ 33, 261 P.3d 697, 706 (Wyo. 2011)). "To be considered reasonable, [DFS'] efforts must 'have been accessible, available and appropriate.'" *MA*, ¶ 29, 505 P.3d at 186 (quoting *SW*, ¶ 20, 491 P.3d at 270); Wyo. Stat. Ann. § 14-3-440(e). DFS' efforts must be tailored to "the unique situation of the family involved." *MA*, ¶ 30, 505 P.3d at 186 (quoting *SW*, ¶ 20, 491 P.3d at 270). To demonstrate reasonable efforts, DFS "must make clear the reasons that necessitated the out of home placement in the first place, and then show how its efforts were directed at remedying those reasons." *Id.* (citations omitted). DFS is not excused from making reasonable efforts to reunify the family just because the parent is incarcerated. *See BP*, ¶ 19, 518 P.3d at 703 (citing *Int. of JW*, 2018 WY 22, ¶ 26, 411 P.3d 422, 427 (Wyo. 2018); *In re FM*, 2007 WY 128, ¶¶ 12–14, 163 P.3d 844, 848 (Wyo. 2007)). Moreover, we have stated that without parental cooperation "continuing efforts to rehabilitate the parent become not only unreasonable, but contrary to a child's best interest at some point." *RR*, ¶ 99, 492 P.3d at 271 (quoting *JW*, ¶ 21, 411 P.3d at 426).

[¶30]  In its January 14, 2022 order, the juvenile court found "[Mother] has had DFS support for almost the entirety of the minor children's lives" and "[i]t is clear from the evidence that DFS has made reasonable efforts to achieve the goal of reunification." The court also found adoption was in the children's best interest. Mother does not dispute the court's best interest finding. Instead, Mother asserts the court abused its discretion when it found DFS made reasonable efforts to reunify her with BN and DN. Mother argues DFS did not make reasonable efforts because it failed to demonstrate that it considered how Mother's mental health affected her ability to cooperate. *See MA*, ¶¶ 29, 36, 505 P.3d at 186, 188. For the reasons stated below, we conclude the juvenile court did not abuse its discretion when it found DFS made reasonable, but unsuccessful, efforts to reunify Mother with BN and DN.

[¶31]  Mother relies on *MA* to support her claim that DFS failed to tailor its efforts to her mental health needs.[3] *Id.* ¶¶ 30–31, 505 P.3d at 186. We considered Mother's argument in her companion appeal. *BP*, ¶¶ 23–25, 518 P.3d at 704. In *BP*, we reasoned "Mother's

---

[3] "To the extent Mother argues that to meet its statutory requirement to provide reasonable efforts to reunify the family DFS had to obtain a diagnosis of and treatment for schizophrenia, we disagree." *BP*, ¶ 23 n.9, 518 P.3d at 704 n.9. The reasonable efforts DFS is required to make do not extend to ensuring a mental health diagnosis and treatment. *See* Wyo. Stat. Ann. § 14-3-204(a)(iv) (stating the duty of DFS is only to "assist" the family "in resolving problems that lead to or caused the child abuse or neglect").

8

reliance on *MA* [was] out of context" because the State never made "allegations of abuse or neglect against the mother," DFS never provided "reasons for removing the children from the mother's home," and the consideration of how the mother's mental health affected her ability to comply with her case requirements "was one factor which cannot be viewed in isolation." *Id.* ¶ 23, 518 P.3d at 704 (citing and quoting *MA*, ¶¶ 32–33, 35–36, 505 P.3d at 187–90). As in the companion appeal, and in contrast to *MA*, Mother has been adjudicated neglectful and received extensive services over the course of several years from DFS and from child protective services in Colorado and Utah. *Id.* ¶ 24, 518 P.3d at 704. And again, we cannot look at Mother's mental health issues in isolation, but we must consider them in the context of Mother's unique circumstances, which are different from the circumstances in *MA*. *Id.* ¶ 23, 518 P.3d at 703 (citing *MA*, ¶ 36, 505 P.3d at 188).

[¶32] For example, in this case Mother was incarcerated throughout the pendency of the juvenile proceedings. When the court conducted the permanency hearing in January 2022, Mother was a patient at the Wyoming State Hospital awaiting an evaluation for her pending criminal cases. We have recognized that, "[w]hat is reasonable must take into account Mother's incarceration and what services are available under the circumstances." *Id.* ¶ 25, 518 P.3d at 704 (citing *JW*, ¶ 21, 411 P.3d at 426 n.8).

[¶33] Taking Mother's incarceration into account, DFS initially met with Mother at the detention center to develop a case plan and identify her needs to help her achieve reunification. In the first and subsequent case plans, DFS not surprisingly identified Mother's needs as being free from incarceration, being sober and mentally stable, and being able to provide prudent, safe, non-harmful and reasonable parenting to her children.

[¶34] In its efforts to address Mother's needs, DFS regularly met with Mother to discuss the progress of her case and offer services.[4] However, as the juvenile court recognized, Mother's incarceration limited the availability of DFS' services. Prior to Mother's admission to the Wyoming State Hospital, DFS referred her to therapy, repeatedly informed her such mental health supports were available at the detention center, and DFS could connect her with such support.[5] Mother's reluctance to cooperate with DFS, as discussed below, ultimately prevented DFS from providing any specific mental health services to Mother during that time.

[¶35] To assist Mother with sobriety and comply with the juvenile court's order requiring her to receive an ASI, DFS referred Mother to Peak Wellness for a substance abuse evaluation. DFS' efforts resulted in Mother completing the ASI and applying for inpatient substance abuse treatment in Sheridan upon her release from incarceration. To assist

---

[4] In addition to efforts discussed here, DFS was simultaneously providing services to Mother in a separate Laramie County case for her other children. *See BP*, ¶¶ 3, 20–21, 518 P.3d at 703.

[5] DFS acknowledged in Mother's companion case that Mother's acceptance of counseling at the Wyoming State Hospital satisfied this requirement of her case plan. *BP*, ¶ 20, 518 P.3d at 703.

9

Mother with improving her parenting, DFS offered her parenting classes and books such as the "Love and Logic" workbook.

[¶36]  DFS also made efforts to address the health and safety of BN and DN.  *SW*, ¶ 27, 491 P.3d at 271 ("In determining what efforts are required, the child's health and safety are the paramount concern." (citing Wyo. Stat. Ann. § 14-3-440(b))).  DFS obtained counseling and therapy for both children, obtained a psychiatric evaluation for DN after he exhibited inappropriate sexual behaviors and violence, and helped facilitate DN's placement into residential treatment.  At Mother's request, DFS also considered putting BN and DN into a family placement, including placement with extended family, though DFS denied the requested placements after background checks.  Further, DFS facilitated and monitored Mother's communication with BN and DN through letters.  DFS also offered Mother the opportunity to have video visits with BN and DN.

[¶37]  Though DFS considered Mother's incarceration when it made efforts to reunify her with BN and DN, DFS had no control over when Mother would be released and able to provide a safe and stable living environment for the children.  We have explained that because the children's health and safety are paramount, their "timely placement . . . in accordance with a permanency plan may take precedence over family reunification[.]" *Id.* ¶ 19, 491 P.3d at 270 (quoting *VS*, ¶ 43, 429 P.3d at 26).  Mother had multiple pending felony criminal charges, and the Wyoming State Hospital informed DFS that Mother may be at the Hospital for up to a year before her criminal evaluation is completed.  Even if the State released Mother, the caseworker testified at the permanency hearing that given Mother's history with DFS, Mother had proven she is unable to provide a consistent stable environment for BN and DN.  The juvenile court expressed a similar concern stating "it is very unclear at what point [Mother] would be free from incarceration and able to provide any shelter or structure or a safe living environment for [BN and DN]."

[¶38]  Further, despite DFS' efforts, Mother was often uncooperative and refused to accept the services DFS offered.  For instance, Mother refused to sign the first two case plans and, when she signed the third case plan, she made several handwritten changes challenging the plan's stated goals and tasks.  Mother also refused to see a therapist while at the detention center despite DFS' referrals and efforts to connect her with mental health treatment.  Mother also refused to sign releases to provide DFS with her treatment information from the Wyoming State Hospital.  The DFS caseworker felt Mother's refusals "thwarted" their efforts to reunify Mother with the children.  This Court has stated that "[a] parent's failure to take advantage of available services, or to meaningfully participate in a case plan developed by DFS with [her] input, is persuasive evidence that reasonable rehabilitative efforts have been unsuccessful." *JW*, ¶ 21, 411 P.3d at 426 (citing *SD v. Carbon Cty. Dep't of Family Servs.*, 2002 WY 168, ¶ 23, 57 P.3d 1235, 1241 (Wyo. 2002)) (footnote omitted); *SW*, ¶ 27, 491 P.3d at 271 (stating that "[a]t some point, the rights and needs of the children rise above the rights and needs of the parent[]" (citation omitted)).

[¶39]   Viewing the evidence in the light most favorable to the State, *MA*, ¶ 27, 505 P.3d at 185–86, we conclude the record adequately supports the juvenile court's determination that DFS met its burden to prove its efforts at reunifying Mother with BN and DN were reasonable but unsuccessful.  Further, considering Mother's history with child protective services, her incarceration, DFS' efforts to provide Mother services despite her minimal cooperation, and BN's and DN's paramount need for timely placement in a safe and stable home, the juvenile court could reasonably conclude the permanency plan should be changed to adoption.  *See BP*, ¶ 25, 518 P.3d at 705.  The juvenile court did not abuse its discretion.

[¶40]   Affirmed.