# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 20

**OCTOBER TERM, A.D. 2022**

March 10, 2023

IN THE MATTER OF THE TERMINATION
OF PARENTAL RIGHTS TO:  ALRW,
minor child,

ROBIN ALLYSSA CAROLINE ALCORN,

Appellant
(Respondent),

v.

STATE OF WYOMING, ex rel.
DEPARTMENT OF FAMILY SERVICES,

Appellee
(Petitioner).

S-22-0204

*Appeal from the District Court of Sheridan County*
*The Honorable William J. Edelman, Judge*

*Representing Appellant:*
    Seth Shumaker, Sheridan, Wyoming.

*Representing Appellee:*
    Bridget L. Hill, Attorney General; Christina F. McCabe, Senior Assistant Attorney
    General; Wendy S. Ross, Senior Assistant Attorney General.

**Office of the Guardian ad Litem:**
    Joseph Belcher, Director, Kimberly Skoutary Johnson, Chief Trial and Appellate
    Counsel, Wyoming Office of the Guardian ad Litem.

*Before FOX, C.J., KAUTZ, BOOMGAARDEN, GRAY, JJ., and CAMPBELL, DJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    Robin Allyssa Caroline Alcorn (Mother) appeals the district court's March 2022 order granting the Wyoming Department of Family Services' (DFS) petition to terminate her parental rights to her young daughter, ALRW, under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (a)(v) (LexisNexis 2021).[1]  We affirm the district court's order under Wyo. Stat. Ann. § 14-2-309(a)(iii).

## *ISSUE*

[¶2]    We restate the issue:

> Whether the record is sufficient to support the district court's determination that DFS made reasonable but unsuccessful efforts to rehabilitate Mother as required by Wyo. Stat. Ann. § 14-2-309(a)(iii).

## *FACTS*

[¶3]    ALRW was born in May 2019.  In early June 2019, Father sought assistance from a neighbor because he believed someone with a rifle was trying to kill him.  The neighbor called the Sheridan Police Department who later performed a welfare check at Father's home where Mother and ALRW lived.  During the welfare check, the officers saw drug paraphernalia and marijuana near where ALRW slept.  The paraphernalia tested presumptive positive for methamphetamine.  The officers also observed significant open sores on the left side of ALRW's neck and her left armpit.  The officers then arrested Mother and Father for child endangerment and took ALRW into protective custody. ALRW later tested positive for methamphetamine after a hair follicle test.

## Juvenile Court Neglect Proceedings

[¶4]    On June 3, 2019, the county attorney filed a petition alleging Mother neglected ALRW.  The juvenile court held a shelter care hearing the next day.  The court found by clear and convincing evidence it was not in ALRW's best interest to return to Mother's home.  Mother agreed to have DFS place the child in non-relative foster care.  At the initial hearing, Mother denied the allegations in the neglect petition.  The court then ordered a multi-disciplinary team (MDT) be established and for DFS to prepare a predisposition report (PDR).  The court soon after held an adjudicatory hearing and found ALRW to be neglected as defined by Wyo. Stat. Ann. § 14-3-202(a)(vii) (LexisNexis 2021).

---

[1]  Dylan Ray Weaver (Father) signed a relinquishment of his parental rights after the termination proceedings commenced.

[¶5]   DFS developed an initial "Family Service Case Plan" in July 2019 without Mother's input.  The case plan listed family reunification as the permanency goal with the concurrent goal of adoption.[2]  The case plan also listed two objectives for Mother to address—(1) mental health and substance abuse, and (2) life stability and parenting skills—along with corresponding tasks for Mother to complete.  The case plan further required Mother to cooperate with DFS.  DFS also established a supervised visitation schedule through Compass, in Sheridan, which allowed Mother to visit ALRW three times per week.  Mother attended one in-person supervised visit that July.  After her visit, Compass recommended Mother receive therapeutic/coached parenting for all future visits.  Mother never attended another in-person visit.

[¶6]   Mother moved to Casper with Father soon after the juvenile case began and was arrested there in late August 2019.  She was charged with possession of methamphetamine and interference with a peace officer.

[¶7]   DFS filed the PDR in October 2019.  It discussed ALRW's complex medical history, noting the child was born with torticollis in her neck and had recently developed several hemangiomas.[3]  It also noted the child "had significant difficulty with constipation."  The PDR described Mother's history of mental health problems, substance abuse, and an abusive relationship with Father.  Mother had been arrested three times for drug-related offenses between 2017 and 2019.

[¶8]   The juvenile court held a disposition and six-month review hearing that month, and ordered the legal and physical custody of ALRW remain with DFS due in part to Mother being incarcerated after a bond revocation.  The court also ordered Mother's visitation with ALRW to be at the discretion of DFS, take place at CASA/Compass, and include coached/therapeutic parenting education.  It further designated family reunification as the permanency plan with the concurrent plan of adoption, adopted DFS' case plan for Mother, and ordered Mother to follow the case plan.

[¶9]   Mother meanwhile pled guilty to child endangerment and was sentenced in November 2019 to 3 to 5 years of incarceration suspended in favor of a split sentence of 270 days in jail and 3 years of supervised probation.  The district court also ordered her to complete residential substance abuse treatment, have no contact with Father, and comply with the DFS case plan.  Mother remained in jail until she was admitted to inpatient

---

[2] The case plan is discussed in-depth below, *infra* ¶¶ 22–33.

[3] Torticollis is a condition where an infant's "neck muscles cause their head to turn and rotate to one side." Cleveland Clinic, *Torticollis: What is Torticollis?*; https://my.clevelandclinic.org/health/diseases/22430-torticollis (last visited February 17, 2023).  "A hemangioma [] is a bright red birthmark that shows up at birth or in the first or second week of life.  It looks like a rubbery bump and is made up of extra blood vessels in the skin." Mayo Clinic, *Hemangioma: Symptoms and Causes*; https://www.mayoclinic.org/diseases-conditions/hemangioma/symptoms-causes/syc-20352334 (last visited February 17, 2023).

treatment. DFS amended the initial case plan in December 2019 to reflect Mother's supervised probation conditions.

[¶10] Mother began inpatient treatment in late January 2020 at the Central Wyoming Counseling Center (CWCC). While in treatment, Mother attended counseling, parenting classes, and co-dependency classes. Mother was discharged in April but quickly relapsed reuniting with Father and using methamphetamine. Several days later, Mother told her probation officer she had herself admitted to the Wyoming Behavioral Institute (WBI) for medication stabilization. Mother was then admitted to a ninety-day intensive outpatient treatment (IOP) at the Casper Re-Entry Program (CRC).

[¶11] The juvenile court held a permanency hearing in late May 2020. Mother acknowledged at the hearing she had contacted Father and used controlled substances. The hearing participants testified to the lack of progress Mother had made in this case. The court then ordered the permanency plan be changed to adoption with the concurrent goal of reunification. The court did not relieve DFS from making reasonable efforts to reunify the family and DFS again updated Mother's case plan to reflect the court's order. In mid-June, a majority of the MDT recommended the permanency plan be changed to solely adoption. Mother did not attend the June MDT meeting.

[¶12] Mother completed her IOP program in July 2020. She was employed while attending the program and obtained housing in Casper. At this time, DFS allowed Mother to have weekly, fifteen-minute, supervised video visits with ALRW, who remained in non-relative foster care in Sheridan. Mother attended the video visits sporadically. Her missed visits caused DFS to suspend visitation in November 2020.

[¶13] Mother was evicted from her Casper home in October 2020 for failing to pay rent. Mother also admitted to her probation officer she had used methamphetamine several times over the previous two months. She claimed to have a new residence after the eviction but did not cooperate with DFS to verify where she was living. She had also lost her previous job but claimed to have obtained new employment.

[¶14] The juvenile court held another permanency hearing in December 2020. The court determined Mother remained a health and safety threat to ALRW even after receiving extensive services from DFS. The court concluded DFS made reasonable but unsuccessful efforts to reunify ALRW with her parents and it was in ALRW's best interest to change the permanency plan to adoption. Accordingly, the court relieved DFS from making further efforts to reunify the family.[4]

---

[4] Around this time, Mother's probation officer informed DFS that Mother was pregnant. Mother gave birth in July 2021 at the Wyoming Medium Correctional Institution in Torrington.

[¶15] After the permanency hearing, Mother avoided her probation officer for several months and refused to provide DFS with her current address. Mother's only contact with DFS during this time was through email. In April 2021, Mother was arrested on an outstanding warrant for violating her supervised probation conditions. Later that month, the district court revoked Mother's probation and imposed her original sentence of incarceration for child endangerment.

**District Court Termination Proceedings**

[¶16] DFS filed its petition to terminate Mother's parental rights to ALRW on August 16, 2021. The district court appointed a Guardian ad Litem and counsel for Mother. The court held a one-day bench trial on February 17, 2022. DFS admitted exhibits and presented testimony from ALRW's foster mother, Devon Noecker, the DFS caseworker, Dana Hillard, and Mother's former probation officer, Brandi Clifton. Mother testified and presented testimony from the DFS caseworker in the juvenile case involving the child born while Mother was incarcerated in Torrington, Melissa Stevens.

[¶17] The district court issued its order the next month holding DFS had presented clear and convincing evidence that Mother's parental rights to ALRW should be terminated under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (a)(v). The court also held termination of Mother's parental rights was in ALRW's best interest. Mother timely appealed.

## *DISCUSSION*

[¶18] Our consideration of whether the district court had sufficient evidence to terminate Mother's parental rights is governed as follows:

> Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence. Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of a contention is highly probable. Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.

4

*Matter of JPL*, 2021 WY 94, ¶ 21, 493 P.3d 174, 179–80 (Wyo. 2021) (quoting *Harmon v. State of Wyo., Dep't of Family Servs. (In re DKS)*, 2020 WY 12, ¶ 19, 456 P.3d 918, 924 (Wyo. 2020)).

[¶19]   The district court terminated Mother's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (a)(v).  We need only to conclude the evidence was sufficient on one of those grounds to affirm.  *JPL*, ¶ 21, 493 P.3d at 180 (citing *In re BAD*, 2019 WY 83, ¶ 15, 446 P.3d 222, 225–26 (Wyo. 2019)).

[¶20]   To terminate Mother's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii), DFS is required to present clear and convincing evidence of three elements: "(1) abusive treatment or neglect by the parent; (2) unsuccessful [reasonable] efforts to rehabilitate the family; and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent." *In re ARC*, 2011 WY 119, ¶ 16, 258 P.3d 704, 708 (Wyo. 2011) (citations omitted).[5]  On appeal, Mother does not challenge elements (1) or (3).  We therefore focus our analysis on element (2)—whether DFS made reasonable but unsuccessful efforts to rehabilitate Mother and reunify her with ALRW.

[¶21]   We assess whether sufficient evidence supports that DFS made reasonable efforts to rehabilitate the family on a case-by-case basis.  *See Int. of BP*, 2022 WY 128, ¶ 19, 518 P.3d 698, 703 (Wyo. 2022) (citing *In re DRS*, 2011 WY 128, ¶ 33, 261 P.3d 697, 706 (Wyo. 2011)); *In re FM*, 2007 WY 128, ¶¶ 11–14, 163 P.3d 844, 848 (Wyo. 2007).  "[T]o demonstrate that its efforts were reasonable, [DFS] must make clear the reasons that necessitated the [child's] out of home placement in the first place, and then show how its efforts were directed at remedying those reasons." *BP*, ¶ 16, 518 P.3d at 702 (quoting *Int. of MA*, 2022 WY 29, ¶ 30, 505 P.3d 179, 186 (Wyo. 2022)); *see also Wyoming, Dep't of Family Servs. v. TWE*, 2009 WY 155, ¶¶ 19, 22, 222 P.3d 142, 146–48 (Wyo. 2009) (upholding the district court's denial of a petition to terminate parental rights in part because DFS' efforts were not directed at the initial reasons for its involvement).  We thus consider "whether or not services to [Mother] have been accessible, available and appropriate[.]" *See BP*, ¶ 16, 518 P.3d at 702 (quoting *Int. of SW*, 2021 WY 81, ¶ 20, 491 P.3d 264, 270 (Wyo. 2021)).  Mother's incarceration does not excuse DFS from making

---

[5] Wyo. Stat. Ann. § 14-2-309(a)(iii) provides:

> (a) The parent-child legal relationship may be terminated if . . . the following facts [are] established by clear and convincing evidence:
>
> . . .
>
> > (iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent[.]

5

reasonable efforts to rehabilitate the family. *See Int. of BN*, 2022 WY 146, ¶ 29, 520 P.3d 529, 535 (Wyo. 2022) (citation omitted); *FM*, ¶¶ 13–14, 163 P.3d at 848.

[¶22] The record demonstrates DFS' efforts were focused on the case plan establishing reunification with ALRW as Mother's permanency goal. Mother neither cooperated with DFS in forming the case plan nor did she ever sign the case plan, despite DFS mailing the plan to her multiple times and discussing it with her throughout the proceedings. The case plan identified two objectives for Mother to address: (1) mental health and substance abuse, and (2) life stability and parenting skills. DFS considered Mother's struggles in each of these areas to have necessitated ALRW's removal from Mother in the first place and continued to impact ALRW's safety, well-being, and permanency. The case plan also listed corresponding tasks Mother was required to complete.[6] We thus consider DFS' efforts to assist Mother in achieving those objectives and completing the required tasks to determine whether its efforts to rehabilitate Mother were reasonable. *See ARC*, ¶¶ 17–22, 258 P.3d at 709; *FM*, ¶¶ 11–14, 163 P.3d at 848; *see also JPL*, ¶¶ 29–52, 493 P.3d at 181–84.

## Mental Health and Substance Abuse

[¶23] The case plan first identified mental health and substance abuse as areas for Mother to address. The plan specifically required Mother to complete an ASI and follow its recommendations. Mother completed an ASI during her initial incarceration; however, she significantly minimized her drug use during the evaluation. The DFS caseworker discussed updating the ASI with Mother and offered to pay, but Mother did not take advantage of the offer. DFS' reports indicate it had also referred Mother to substance abuse treatment at the Volunteers of America (VOA), CWCC, and CRC.

[¶24] Mother never accessed treatment through DFS but was admitted to CWCC after her conviction for child endangerment. DFS acknowledged Mother's inpatient treatment satisfied this requirement of the case plan. Yet, Mother returned to using methamphetamine immediately after she was discharged and continued using until her probation was revoked and original sentence of incarceration imposed. Mother admitted to the district court she had relapsed "three or four times" throughout the proceedings. Mother's continuous substance abuse was thus a barrier to DFS' efforts to rehabilitate and reunify her with ALRW.

[¶25] The case plan also required Mother to complete a psychiatric evaluation and a parental capacity evaluation. DFS offered to pay the costs of the psychological evaluation, but Mother did not cooperate with DFS to access this evaluation. Mother claimed to have completed the evaluations at different times throughout the proceedings, but copies of the

---

[6] DFS updated the case plan at least two times during the proceedings. Mother's objectives and required tasks remained the same with few additional tasks added.

6

evaluations were never provided to DFS. Mother was also required to attend narcotics/alcoholics anonymous meetings three times per week and provide DFS with verification of her attendance. Mother attended counseling while she was in treatment at CWCC and DFS referred Mother to counseling services when she was not incarcerated, including NA/AA. However, Mother did not provide DFS with documentation regarding any counseling she received or NA/AA attendance outside of incarceration.

**Life Stability and Parenting Skills**

[¶26] The case plan's second objective was for Mother to improve her life stability and parenting skills. The plan required Mother to participate in a trauma-based parenting group and therapeutic/coached parenting education during her visits with ALRW. Mother never completed the required parenting classes. The record shows Mother had access to the Love and Logic parenting class while she attended CWCC, but never notified DFS she completed the class. DFS offered Mother therapeutic/coached visitation with ALRW at Compass in Sheridan. Mother was initially scheduled to visit ALRW at Compass three times per week starting in July 2019. After her first visit, Mother missed the next several visits. She had other plans with Father, was dealing with housing and transportation issues, and then was incarcerated in August 2019. Mother had a brief period outside incarceration in April 2020 but relapsed before any further visits with ALRW were scheduled.

[¶27] Mother requested in-person visits with ALRW in Casper, but DFS denied her request because of ALRW's health issues, and because therapeutic/coached visitation was unavailable in Casper. DFS offered to reimburse Mother for mileage from Casper to Sheridan and back, but Mother did not take advantage of DFS' offer. By the time of the termination hearing in February 2022, Mother had not seen ALRW in-person since July 2019.

[¶28] DFS also offered Mother fifteen minutes of video visitation with ALRW each week after Mother completed her IOP program in July 2020. Mother attended some of the offered video visits but missed several due to oversleeping, attending court proceedings, forgetting, or generally failing to show up. DFS suspended the video visits in November 2020 due to the child's young age and medical concerns, and Mother's missed visitations.

[¶29] To fulfill her parenting skills objective, the case plan further required Mother to follow up on ALRW's medical appointments and monitor the child's torticollis and hemangiomas. ALRW developed several medical conditions throughout the juvenile proceedings beyond her initial health issues. ALRW was diagnosed with asthma, central and obstructive sleep apnea, and significant "limb arousal." Her constipation became a chronic issue requiring significant medical attention. ALRW's foster mother testified to administering the child's medication on a strict schedule and the "daily, weekly, and monthly" doctor's visits required to manage the child's constipation and other conditions. DFS provided Mother with information on ALRW's medical condition and medical

appointments either through email or phone calls. Mother did not attend any of the medical appointments. Mother also admitted she had not contributed to ALRW's medical needs and lacked the knowledge to manage the child's medical conditions.

[¶30] To address Mother's life stability, the case plan required her to "obtain and maintain safe housing[.]" Mother lived in Sheridan when the case began but had been evicted from that home due to criminal behaviors and nonpayment of rent. Mother then moved to Casper with Father but did not cooperate with DFS in providing a verifiable address. Mother obtained housing after completing her IOP program in July 2020; however, she was evicted in October for failing to pay rent. Mother claimed to have a new residence after the eviction but again did not cooperate with DFS to verify where she was living. Mother then refused to provide DFS with any address between October 2020 and April 2021. The DFS caseworker testified that without Mother's cooperation DFS could not assist her with locating housing.

[¶31] The case plan also required Mother to "[o]btain and maintain employment sufficient to meet [the] family's financial needs[.]" Mother gained employment during her IOP program but self-reported different employment by the time of the permanency hearing in December 2020. The DFS caseworker testified Mother refused to provide DFS with documentation supporting employment, and Mother had not given any financial support to ALRW.

**Other DFS Efforts**

[¶32] The case plan required Mother to "[m]aintain weekly contact with DFS either in-person, via phone or email[.]" The DFS caseworker testified that Mother did not communicate well with DFS. The record shows DFS communicated with Mother through phone calls, email, and visits to the jail. Yet, Mother often refused to answer DFS' questions, did not ask about ALRW until over a year into the case, and never asked about how she could help with ALRW's medical conditions. DFS only learned about Mother's relapses through her probation officer. The caseworker further testified that Mother requested only general updates on ALRW through email "about once a month[,]" but otherwise had inconsistent contact with DFS until she was incarcerated.

[¶33] Though the case plan also required Mother to "[f]ollow all terms of probation[,]" Mother's probation officer testified that Mother failed to maintain regular contact. The probation officer also testified that Mother's failure to show up for office visits, provide drug tests, and follow through on a probation sanction after she admitted to using methamphetamine, resulted in a warrant for Mother's arrest and eventual probation revocation. DFS collaborated with Mother's probation officer to assist Mother, and Mother's case plan's expectations mirrored her probation conditions. The DFS caseworker confirmed Mother violated her probation conditions throughout the juvenile proceedings.

8

[¶34] Notwithstanding this evidence, Mother relies on our decision in *FM* to challenge DFS' reasonable efforts to rehabilitate her. *FM*, 2007 WY 128, 163 P.3d 844. In *FM*, the mother was either incarcerated or outside the state's jurisdiction for most of the proceedings before the district court terminated her parental rights. *See id.* ¶¶1, 5–6, 163 P.3d at 846–47. The mother received no services from DFS throughout the case "with regards to finding housing, employment, or completing other tasks set out in [her] case plan." *Id.* ¶ 12, 163 P.3d at 848. DFS also did not make any efforts to facilitate communication between the mother and FM while the mother was incarcerated. *Id.* ¶ 13, 163 P.3d at 848. This Court held that "under [these] circumstances, even given [the mother's] incarceration," clear and convincing evidence was not presented to show DFS made reasonable but unsuccessful efforts to rehabilitate the family. *Id.* ¶ 14, 163 P.3d at 848.

[¶35] In contrast to the circumstances in *FM*, DFS presented ample evidence of its efforts to rehabilitate Mother. For example, DFS offered Mother supervised visitation, video visitation, various treatment referrals, parenting classes, counseling services, monetary support, and other services to help her complete her case plan. Mother did not take advantage of these services while incarcerated or when she was free. The record further shows DFS was unable to assist Mother with housing or employment because Mother would not provide DFS with her current address or communicate with DFS about her employment status.

[¶36] We acknowledge Mother's efforts to maintain sobriety as the termination trial approached, and we genuinely hope she can improve her circumstances long term. However, her status on the eve of trial does not change the fact she made no meaningful progress on her case plan throughout this case despite DFS' efforts discussed above. By the termination hearing, ALRW had been in non-relative foster care for over two and a half years—essentially her entire life. This Court has stated:

> "'When the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield.'" *SD v. Carbon County Dep't of Family Servs.*, 2002 WY 168, ¶ 27, 57 P.3d 1235, 1241 (Wyo. 2002), quoting *Matter of MLM*, 682 P.2d 982, 990 (Wyo. 1984). While parents have a fundamental right to raise their children, children have a right to stability and permanency in their family relationships.

*JPL*, ¶ 62, 493 P.3d at 186 (quoting *In re AD*, 2007 WY 23, ¶ 31, 151 P.3d 1102, 1109–10 (Wyo. 2007)). The record supports the district court's holding that DFS made reasonable but unsuccessful efforts to rehabilitate and reunify Mother with ALRW under Wyo. Stat. Ann. § 14-2-309(a)(iii).

[¶37] We affirm on that ground.

9