# IN THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 37

APRIL TERM, A.D. 2024

April 1, 2024

IN THE MATTER OF THE TERMINATION
OF PARENTAL RIGHTS TO: PML and
EGL, minor children,

CHELSEY MARIE SMITH,

Appellant
(Respondent),

v.                                                          S-23-0168

STATE OF WYOMING, ex rel.
DEPARTMENT OF FAMILY SERVICES,

Appellee
(Petitioner).

*Appeal from the District Court of Sublette County*
*The Honorable Suzannah G. Robinson, Judge*

*Representing Appellant:*
    Donna D. Domonkos, Domonkos & Thorpe, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
    Bridget L. Hill, Wyoming Attorney General; Christina F. McCabe, Deputy Attorney
    General; Wendy S. Ross, Senior Assistant Attorney General; Kristine D. Rude,
    Assistant Attorney General. Argument by Ms. Rude.

*Office of the Guardian ad Litem:*
    Joseph R. Belcher, Director, and Kimberly Skoutary Johnson, Chief Trial and
    Appellate Counsel.

*Before FOX, C.J., and *KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

*\* Justice Kautz retired from judicial office effective March 26, 2024, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2023), he was reassigned to act on this matter on March 27, 2024.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]   Chelsey Marie Smith (Mother) appeals the district court's order granting the Wyoming Department of Family Services' (the Department) petition to terminate her parental rights to her children, PML and EGL, under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v) (2023).[1]  We affirm the court's termination order under Wyo. Stat. Ann. § 14-2-309(a)(iii).

## ISSUE

[¶2]   We state the dispositive issue as:

> Whether the record contains sufficient evidence to support the district court's determination that the Department made reasonable but unsuccessful efforts to rehabilitate Mother as required by Wyo. Stat. Ann. § 14-2-309(a)(iii).

## FACTS

[¶3]   PML and EGL were born in 2014 and 2016, respectively.  In late July 2018, in Sublette County, Mother's neighbor called law enforcement to report hearing one of the children crying for over an hour and not knowing where Mother was located.  When a police officer arrived at Mother's apartment, he found PML alone outside in cold weather and EGL alone inside.  Mother eventually returned to the apartment and was arrested for child endangerment.  The children were placed with their maternal grandparents.

### Juvenile Court Neglect Proceedings

[¶4]   The county attorney filed a petition alleging Mother neglected the children.  The juvenile court promptly held an initial hearing and continued to place the children in the physical custody of their grandparents under the supervision of the Department.  The court allowed Mother to retain legal custody.  The court also continued the hearing for Mother to obtain counsel.  After doing so, Mother denied the neglect allegations.

[¶5]   The Department completed a Predisposition Report (PDR) in September.  The PDR discussed Mother's family history and noted Mother lived alone with the children at the time of their removal.  The PDR stated Mother needed financial support and would benefit from career training.  It also identified three issues for Mother to address that impacted the safety of the children: (1) parental supervision, (2) parenting skills and application, and (3) healthy coping skills.  The PDR did not include reports from Mother that she suffered from any mental health or substance abuse issues, although Mother did indicate she had

---

[1] The children's father relinquished his parental rights and is not a party to this appeal.

participated in counseling when she was younger. That month, Mother began a parenting course and individual counseling sessions.

[¶6] In October, Mother signed an initial family case plan with the Department. The case plan's stated goal was for Mother to "develop mental health stability, coping skills and parenting skills so she can take care of [the children] in an appropriate and effective manner." The case plan required Mother to complete a mental health evaluation by October 30, 2018, to complete a Department-approved parenting course, and to attend ten counseling sessions by the end of the year.

[¶7] In early November, the juvenile court held adjudication in abeyance after Mother and the Department entered a consent decree. The consent decree required Mother to complete the same tasks articulated in the Department's initial case plan. By the end of 2018, Mother only made minor progress on these tasks and failed to complete them by the consent decree's deadline. The juvenile court revoked the consent decree in January 2019. Meanwhile, in Mother's criminal case, the district court deferred her child endangerment charge and placed her on unsupervised probation for one year.

[¶8] In early 2019, Mother quit her job "due to stress" and was evicted from her apartment. Mother then moved briefly to Cheyenne but did not provide the Department an updated address. In March, Mother visited Sublette County and took the children from their grandparents' home despite only being allowed supervised visitation. Law enforcement stopped Mother's car and arrested her for custodial interference. The arresting officer observed PML buckled with a lap-and-shoulder belt rather than a car seat. Two days later, the juvenile court granted the Department legal custody of the children, and the Department placed them in nonrelative foster care. Mother later admitted the neglect allegations in the county attorney's petition and the juvenile court adjudicated the children to be neglected.

[¶9] Between March and August, Mother moved back to Sublette County, made some progress in her parenting class, and again started to attend weekly individual counseling. After months of delay, Mother completed the mental health evaluation. However, the evaluator could not reach a diagnosis because Mother provided inaccurate or incomplete information. Mother also informed the evaluator she had no interest in counseling services. The evaluator nevertheless recommended Mother continue her individual counseling and complete a full psychological evaluation.

[¶10] In July, the juvenile court ordered Mother to obtain a new mental health evaluation. The court also ordered her to participate in individual counseling, family counseling, and parenting classes as recommended by any evaluations and the Department. The court further established a concurrent permanency plan of family reunification and guardianship or adoption. Later that month, the court held a permanency hearing and reaffirmed the permanency plan. Mother continued to attend individual counseling and had sessions with

the children to work on her parenting skills. She also regularly attended scheduled visitation with the children and the Department arranged for a therapist to go into Mother's home to work with her once she obtained housing. Mother had obtained housing by September.

[¶11] In November, Mother completed the second mental health evaluation. In the evaluation, Dr. Mark Gibson diagnosed Mother with a mild intellectual disability, other specified bipolar and related disorder (mixed testing results and symptom denial), and features of narcissistic personality disorder. He also noted one of the tests indicated Mother had some possible substance abuse issues, though nothing else known about Mother suggested "the immediate need for substance abuse treatment." Dr. Gibson recommended Mother continue individual counseling and complete a parenting course. He also recommended that Mother be assessed by a psychiatric professional to see if medication would be helpful for mood disorder issues; however, he acknowledged Mother had "no desire" to take medication and "none may be necessary."

[¶12] In December, Mother's visits and phone calls with the children had become inconsistent. As a result, the Department decided to discontinue Mother's phone calls with the children to focus on weekly, in-person visits. Mother progressed on her case plan in the first half of 2020. Mother once again regularly attended visits and continued to attend mental health counseling. She also completed her parenting class. However, during this time, Mother lost her job after she "put her hands" on another employee and had involved herself with a person who had a criminal background without informing the Department. At the start of the COVID-19 pandemic, in Spring 2020, Mother maintained sporadic telephone and video contact with the children. In May, she was able to attend her first in-person visit since the pandemic began.

[¶13] The Department then permitted Mother unsupervised visits with the children in public locations, such as parks. Mother was soon allowed to have unsupervised visits at her home and the Department allowed overnight visits by mid-July. The juvenile court had scheduled a permanency hearing for mid-August but continued it one month out to give Mother the opportunity to demonstrate her ability to parent the children.

[¶14] As Mother moved toward overnight visits, the Department learned Mother acquired a criminal charge for vandalizing a public restroom. The Department also received a report from the children's foster parents that the children threatened the foster mother and used poor language after returning from visits with Mother. Mother also caused PML to miss three days of the first week of school and accrue one tardy, had difficulties paying her rent despite having the money to pay it, and regularly threatened to hurt the children's foster mother. Further, on one overnight visit, Mother had the children spend the night at their grandfather's home without the Department's approval.

[¶15]  In mid-September, the juvenile court held the previously scheduled permanency hearing.  The Department recommended the permanency plan be changed to adoption.  The court ultimately accepted the Department's recommendation and ordered that the permanency plan be changed to adoption.  Mother did not appeal this order, and failed to make any progress on her case plan after the change.  She continued to receive visitation with the children, but she also continued to engage in criminal activity.  In March 2021, the court relieved the Department from making further efforts to reunify Mother with the children.

**District Court Termination Proceedings**

[¶16]  In January 2022, the Department filed a petition seeking to terminate Mother's parental rights to the children.  The district court appointed a guardian ad litem to represent the children.  In May, at her request, the court appointed counsel for Mother.

[¶17]  The district court held a five-day bench trial in January 2023.  The Department offered exhibits and presented testimony from four caseworkers, three police officers, Mother's probation officer, a school employee, Mother's counselor, and Dr. Gibson.  Mother and the guardian ad litem did not present testimony but both cross-examined the Department's witnesses.  Mother did not testify but offered exhibits into the record.  In February 2023, the district court issued an oral ruling terminating Mother's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v).[2]  The court incorporated its oral ruling into a written order later that month.

[¶18]  Mother timely appealed.

---

[2] Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v) state:

> (a) The parent-child legal relationship may be terminated if . . . the following facts [are] established by clear and convincing evidence:
> . . .
> (iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent[.]
> . . .
> (v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

*STANDARD OF REVIEW*

[¶19]  We analyze whether the district court had sufficient evidence to terminate Mother's parental rights under the following standard:

> Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny.  As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence.  Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of a contention is highly probable.  Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination.  Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.

*Matter of ALRW*, 2023 WY 20, ¶ 18, 525 P.3d 627, 630–31 (Wyo. 2023) (quoting *Matter of JPL*, 2021 WY 94, ¶ 21, 493 P.3d 174, 179–80 (Wyo. 2021)).

## *DISCUSSION*

[¶20]  The district court terminated Mother's parental rights on two separate grounds: Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v).  We have long held we may affirm on either ground.  *ALRW*, 2023 WY 20, ¶ 18, 525 P.3d at 631 (citing *JPL*, ¶ 21, 493 P.3d at 180); *SD v. Carbon Cnty. Dept. of Family Servs.*, 2002 WY 168, ¶ 6, 57 P.3d 1235, 1238 (Wyo. 2002)).  Mother squarely frames her appeal around the first ground—Wyo. Stat. Ann. § 14-2-309(a)(iii).[3]

[¶21]  To terminate Mother's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii), the Department is required to present clear and convincing evidence of three elements: "(1) abusive treatment or neglect by the parent; (2) unsuccessful [reasonable] efforts to rehabilitate the family; and (3) the child's health and safety would be seriously jeopardized

---

[3] Mother asserts the Department is required to make reasonable efforts under Wyo. Stat. Ann. § 14-2-309(a)(v).  This position was endorsed in a special concurrence in *Matter of BAD*, 2019 WY 83, ¶¶ 22–39, 446 P.3d 222, 227–33 (Wyo. 2019).  Mother, however, fails to develop any argument with citations to controlling legal authority that reasonable efforts are required under § 14-2-309(a)(v).  Because we affirm on other grounds we do not address or resolve this claim.  *ALRW*, 2023 WY 20, ¶ 18, 525 P.3d at 631 (citation omitted).

by remaining with or returning to the parent." *ALRW*, 2023 WY 20, ¶ 20, 525 P.3d at 631 (quoting *In re ARC*, 2011 WY 119, ¶ 16, 258 P.3d 704, 708 (Wyo. 2011)). Mother does not challenge elements (1) and (3) on appeal. Our focus is therefore on whether the Department made reasonable but unsuccessful efforts to rehabilitate Mother and reunify her with the children.

[¶22] We assess on a case-by-case basis whether sufficient evidence exists to demonstrate the Department made reasonable efforts to rehabilitate the family. *Id.* at ¶ 21, 525 P.3d at 631 (citing *Int. of BP*, 2022 WY 128, ¶ 19, 518 P.3d 698, 703 (Wyo. 2022); *In re FM*, 2007 WY 128, ¶¶ 11–14, 163 P.3d 844, 848 (Wyo. 2007)). "[T]o demonstrate that its efforts were reasonable, [the Department] must make clear the reasons that necessitated the [children's] out of home placement in the first place, and then show how its efforts were directed at remedying those reasons." *Id.* (quoting *BP*, ¶ 16, 518 P.3d at 702). As such, we must consider whether the Department's services to Mother "have been accessible, available, and appropriate." *Id.* (citation omitted); *see also* Wyo. Stat. Ann. § 14-3-440(e) ("Reasonable efforts determinations shall include whether or not services to the family have been accessible, available and appropriate.").

**The Case Plan's Objectives**

[¶23] The record shows the Department's efforts were focused on the case plan's permanency goal of reunifying Mother with the children. The Department developed an initial case plan and updated it multiple times throughout the case. It initially identified three general objectives for Mother to address: mental health stability, coping skills, and parenting skills. In later plans, the Department also included obtaining employment, stable housing, and regular visitation with the children to build their connection with Mother. Each of these objectives related to the basis for the children's removal from Mother in the first instance and/or impacted their continued safety, well-being, and permanency.

[¶24] Mother argues the Department failed to add substance abuse as an objective in the case plan and thus it failed to make reasonable efforts to address that issue. Notably, substance abuse was not a basis for the children's removal. *See ALRW*, 2023 WY 20, ¶ 20, 525 P.3d at 631 (stating the Department's efforts must be focused on "the reasons that necessitated the [child's] out of home placement in the first place" (citation omitted)). Further, the record does not show Mother had substance abuse problems that prevented her from achieving her case plan goals or that the Department was aware of any such problems. *Id.* at ¶ 18, 525 P.3d at 630–31.

[¶25] Mother also contends the Department erred when it did not add a psychiatric assessment for medication as part of her case plan. To this point, the Department required Mother to complete a mental health evaluation. After Dr. Gibson completed his evaluation and diagnosed Mother with a mild intellectual disability, he opined a psychiatric assessment would be helpful, but medication may not be necessary. Dr. Gibson also

6

acknowledged that Mother had "no desire" to take medication. Following this evaluation, the Department chose not to overwhelm Mother by adding an additional case plan requirement because her probation officer was pursuing a psychiatric assessment through her criminal case. Examining the evidence in the light most favorable to the Department, we conclude the Department's decision not to add a psychiatric assessment to Mother's case plan was reasonable. *See ALRW*, 2023 WY 20, ¶ 18, 525 P.3d at 630–31 (citation omitted).

[¶26] We now consider whether the Department's efforts to rehabilitate Mother by assisting her with the case plan's stated objectives and required tasks were reasonable. *Id.* at ¶ 20, 525 P.3d at 631.

## Mental Health Stability and Coping Skills

[¶27] From the outset of the juvenile proceedings, the case plan required Mother to obtain a mental health evaluation. The Department initially located an evaluator, but Mother delayed taking the evaluation for several months and missed the deadlines set out in the case plan and consent decree. When Mother eventually completed the first evaluation, the evaluator could not reach a diagnosis because Mother had arrived thirty minutes late to her appointment, did not bring the required paperwork, and misleadingly presented herself in a better light. Mother did not complete a valid mental health evaluation until November 2019, over fifteen months after the children had been removed.

[¶28] For this reason, the Department could not tailor its initial efforts based on any diagnosis. Nonetheless, it worked closely with Mother to ensure she understood and had the ability to complete the case plan's requirements. For example, the caseworkers frequently met with Mother in-person and, at times, met with her multiple times a week. The Department also adjusted the case plan's tasks to be more manageable for Mother—adjusting Mother's visitation with the children to help facilitate her regular attendance and tailoring case plan requirements based on how many tasks Mother could work on without becoming overwhelmed.

[¶29] The Department also assisted Mother in keeping track of case plan tasks, important appointments, and other activities by writing what Mother needed to remember on note cards, providing a journal, developing a calendar, and suggesting other options she could use to stay organized. Further, once Mother was diagnosed with a mild intellectual disability, the Department continued to tailor the case plan to Mother's needs.[4] It continued meeting with Mother in person and arranged for Mother to visit her children in person to

---

[4] Mother argues the Americans with Disabilities Act (ADA) required the Department to accommodate her intellectual disability as part of its reasonable efforts for rehabilitation. However, Mother does not cite to any specific ADA provisions or explain what disabilities and related accommodations the Department should have considered. We therefore decline to consider Mother's argument. *Evans*, 2023 WY 55, ¶ 44, 530 P.3d at 313 (citation omitted).

avoid her becoming overwhelmed by a combined schedule of in-person and telephone visits.

[¶30] Concerning Mother's individual counseling requirement, the Department recommended a mental health provider who had experience working with clients with intellectual disabilities. Mother began her counseling sessions in September 2018, but her attendance was sporadic, and she failed to complete the required ten sessions prior to the consent decree's deadline. When Mother moved to Cheyenne, the Department successfully referred her to another provider but Mother attended only two of five scheduled sessions. When Mother returned to Sublette County, the Department contacted her former provider so Mother could promptly resume individual counseling sessions. When her provider retired in July 2020, the Department further assisted Mother in finding a new provider. Despite these efforts, Mother acknowledged she was merely "jumping through the hoops" to complete the case plan requirement.

**Parenting Skills**

[¶31] The case plan also required Mother to complete a parenting class. In 2018, Mother began an individual parenting class with her mental health provider. The provider also conducted family sessions to allow Mother to demonstrate her parenting skills and obtain immediate feedback in her individual therapy sessions. The Department also asked the provider to perform hands-on parenting education during Mother's supervised visits with the children.

[¶32] Mother failed to complete the parenting class by the end of December 2018 as the initial case plan and consent decree required. At that time, she indicated she did not need parenting classes and did not learn anything from reading the parenting book the Department provided. Mother asked the Department if she could instead attend online parenting classes. The Department declined, believing Mother needed accountability from an in-person class. While the Department tried to find a local mental health provider who could teach in-person classes in Cheyenne, Mother nevertheless completed an online parenting class. Mother did not complete the in-person parenting class with her mental health provider in Sublette County until May 2020.

[¶33] The Department scheduled several visitations between Mother and the children, both supervised and unsupervised, as well as phone calls, to give Mother an opportunity to demonstrate her parenting skills and maintain a connection with them. Mother's participation in the regularly scheduled phone calls was inconsistent. For example, during the COVID pandemic, the Department facilitated phone and video visitations. Mother could have had up to five phone or video visits per week but missed several of these visits. To address Mother's inconsistent participation, the Department stopped scheduling the phone calls and, when necessary, reduced the number of visits to accommodate Mother's concerns about the overwhelming nature of the schedule. By May 2020, Mother again

made progress and the Department resumed Mother's unsupervised visits with the children, which eventually lead to overnight visits.

## Employment and Stable Housing

[¶34] The Department identified Mother's ability to financially support and provide housing to the children as potential barriers to reunification. The case plan therefore required Mother to obtain employment and stable housing. In 2018, after Mother quit her job out of frustration, the Department referred her to vocational rehabilitation in the same facility where Mother received counseling services. It also encouraged her to identify available child care for the children during the day as preparation for the potential return of the children. Later in the case, the Department assisted Mother in obtaining a caseworker from the Department of Workforce Services, reviewed Mother's resume, and helped her track job applications. The Department's efforts initially succeeded as Mother was able to find employment between 2019 and 2020. Additionally, because Mother was evicted from her apartment in early 2019, the Department required Mother to research affordable housing options and notify the Department which housing she was considering. When Mother eventually obtained housing, the Department worked with Mother to form a budget to help her pay rent.

## *CONCLUSION*

[¶35] The record demonstrates the Department made numerous efforts to help Mother improve her mental health, demonstrate her parenting skills, obtain and sustain employment, and create a safe home for her children. Mother made occasional progress which ultimately delayed the Department from seeking to terminate her parental rights, but after almost three years she could not consistently abide by or achieve the objectives set out in the Department's case plan—she actively resisted it at times—and was unable to create a safe and stable environment for reunification with the children. For example, Mother waited over a year before completing a valid mental health evaluation, considered her mental health counseling to be a waste of time, had a pattern of inconsistent employment either from quitting or being fired, failed to pay rent despite having the funds to do so, engaged in criminal activity, and the Department received reports the children used inappropriate language around their foster parents when they returned from Mother's care. The Department also learned that Mother had caused one of the children to miss several days of school during a series of overnight visitations, she actively threatened the children's foster mother, and she had the children spend the night with their grandparents without Department approval.

[¶36] Under circumstances like these, "[w]hen the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield." *ALRW*, 2023 WY 20, ¶ 36, 525 P.3d at 634 (quoting *JPL*, 2021 WY 94, ¶ 62, 493 P.3d at 186). Mother has a fundamental right to raise her children, but "the children have a right to stability and

permanency in their family relationships." *Id.* Viewing the evidence in the light most favorable to the Department, clear and convincing evidence supports that the Department made reasonable but unsuccessful efforts to rehabilitate Mother and reunify her with the children under Wyo. Stat. Ann. § 14-2-309(a)(iii). *ALRW*, 2023 WY 20, ¶ 18, 525 P.3d at 630–31 (citation omitted).

[¶37]  We affirm on that ground.